**Agreed-Upon Redacted Copy - May Be Made Public**

No. 07-55C
(JUDGE WHEELER)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CHE CONSULTING, INC.,
Plaintiff,

v.

THE UNITED STATES,
Defendant,

and

STORAGE TECHNOLOGY CORPORATION,
Defendant-Intervenor.

# DEFENDANT'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Acting Director

BRIAN M. SIMKIN
Assistant Director

ANDREW SINN
Assistant Regional Counsel
U.S. GSA Office of Regional Counsel (4L)
77 Forsyth St., Suite 600
Atlanta, GA 30303

F. JEFFERSON HUGHES
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

Dated: February 16, 2006

Attorneys for Defendant

**Agreed-Upon Redacted Copy - May Be Made Public**

# TABLE OF CONTENTS


PAGE

TABLE OF AUTHORITIES . . . . . iii

QUESTIONS PRESENTED . . . . . 1

STATEMENT OF THE CASE . . . . . 2

STATEMENT OF FACTS . . . . . 2

A. Procurement Background . . . . . 2

B. History Of The Procurement . . . . . 7

C. CHE Protests To The GSA . . . . . 10

D. GSA Denies CHE's Protest . . . . . 11

E. CHE Sues In This Court . . . . . 12

ARGUMENT . . . . . 12

I. NAVO Is Entitled To Judgment On The Administrative Record . . . . . 12

A. CHE Must Prove NAVO Acted Irrationally . . . . . 12

1. Rule 52.1 Standards . . . . . 12

2. Standard Of Review . . . . . 12

3. Solicitation Terms Should Meet An Agency's Minimum Needs . . . . . 14

B. CHE Has Failed To Prove That NAVO Acted Irrationally . . . . . 15

1. The "Bundling" Requirement Meets NAVO's Minimum Needs . . . . . 15

2. The "Bundling" Requirement Is Not Unduly Restrictive . . . . . 19

C. CHE Is Not Entitled To Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**Agreed-Upon Redacted Copy - May Be Made Public**

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

A & D Fire Protection, Inc. v. United States,
72 Fed. Cl. 126 (2006) . . . . . 12

Amoco Prod. Co. v. Vill. of Gambell, Alaska,
480 U.S. 531 (1987) . . . . . 21

Avtel Services, Inc. v. United States,
70 Fed. Cl. 173 (2006) . . . . . 21

Banknote Corp. of America, Inc. v. United States,
365 F.3d 1345 (Fed. Cir. 2004) . . . . . 12, 18

Bannum, Inc. v. United States,
404 F.3d 1346 (Fed. Cir. 2005) . . . . . 12

Blue & Gold Fleet, LP v. United States,
70 Fed. Cl. 487 (2006) . . . . . 21, 22

CACI, Inc.-Fed. v. United States,
719 F.2d 1567 (Fed. Cir. 1983) . . . . . 13

CHE Consulting, Inc. v. United States,
__ Fed. Cl. ___, 2006 WL 3746676 (Dec. 15, 2006) . . . . . 17, 19

CHE Consulting, Inc. v. United States,
47 Fed. Cl. 331 (2000) . . . . . 19

Citizens to Preserve Overton Park, Inc. v. Volpe,
401 U.S. 402 (1971) . . . . . 13

EP Productions, Inc. v. United States,
63 Fed. Cl. 220 (2005) . . . . . 13, 21

Fire-Trol Holdings, LLC v. United States,
66 Fed. Cl. 36 (2005) . . . . . 14

Honeywell, Inc. v. United States,
870 F.2d 644 (Fed. Cir. 1989) . . . . . . . . . . 13

Impresa Construzioni Geom. Domenico Garufi v. United States,
238 F.3d 1324 (Fed. Cir. 2001) . . . . . . . . . . 12, 13

International Outsourcing Services, L.L.C. v. United States,
69 Fed. Cl. 40 (2005) . . . . . . . . . . 18

KSEND v. United States,
69 Fed. Cl. 103 (2005) . . . . . . . . . . 21

M. Steinthal & Co. v. Seamans,
455 F.2d 1289 (D.C. Cir. 1971) . . . . . . . . . . 13

Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,
463 U.S. 29 (1983) . . . . . . . . . . 13

PGBA, LLC v. United States,
389 F.3d 1219 (Fed. Cir. 2004) . . . . . . . . . . 21

Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Ltd.,
2006 WL 1766434 (D. Mass. June 28, 2006) . . . . . . . . . . 19

United Enter. & Associates v. United States,
70 Fed. Cl. 1 (2006) . . . . . . . . . . 15

Wit Associates, Inc. v. United States,
62 Fed. Cl. 657 (2004) . . . . . . . . . . 14, 15, 17

**STATUTES & REGULATIONS**

48 C.F.R. § 6.101(b) . . . . . . . . . . 14

48 C.F.R. § 11.002(a)(1)(ii) . . . . . . . . . . 14

5 U.S.C. § 706 . . . . . . . . . . 12

10 U.S.C § 2304 . . . . . . . . . . 14, 20

28 U.S.C. § 1491(b) . . . . . . . . . . 12, 21

41 U.S.C. § 253(1) . . . . . . . . . . 20

Agreed-Upon Redacted Copy - May Be Made Public

**Agreed-Upon Redacted Copy - May Be Made Public**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| CHE CONSULTING, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 07-55C |
| THE UNITED STATES, | ) | (Judge Wheeler) |
| Defendant, | ) | |
| and | ) | |
| STORAGE TECHNOLOGY CORPORATION, | ) | |
| Defendant-Intervenor | ) | |

**DEFENDANT'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

Defendant, the United States, respectfully requests that the Court issue judgment upon the administrative record in defendant's favor pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"). As the record reveals, the agency's decision at issue in this case was reasonable and should not be overturned. In support of this motion, defendant relies upon the Complaint ("Compl.") filed by protester CHE Consulting, Inc. ("CHE"), the administrative record ("AR"), and the following memorandum.

**DEFENDANT'S BRIEF**

**Questions Presented**

1. Whether NAVO is entitled to judgment upon the administrative record because the agency's actions were rational.

2. Whether CHE's request for permanent injunctive relief should be denied.

**Agreed-Upon Redacted Copy - May Be Made Public**

## Statement Of The Case

Plaintiff, CHE, seeks declaratory and injunctive relief relating to a decision by the Naval Oceanographic Office ("NAVO" or "agency") Major Shared Resource Center ("MSRC") and General Services Administration ("GSA") to cancel solicitations conducted on NAVO's behalf by GSA that allowed for separate awards for hardware and software maintenance support and instead to issue solicitations through GSA seeking vendors who could provide both hardware and software maintenance support. Compl. 6-8. Before filing suit in this Court, CHE filed a protest regarding this matter with GSA. AR 191-96. The GSA denied CHE's protest. AR 139-43. CHE then filed suit in this Court, seeking (1) a declaration that the agency's "bundling" of hardware and software maintenance services is improper and not in accordance with applicable laws and regulations; (2) a declaration that the agency's decision not to engage in "market research" of other DoD agencies' practices with respect to such "bundling" was improper; (3) an injunction restraining the agency from proceeding with its re-issued solicitations; (4) a ruling from the Court directing the agency to revise its solicitation; (5) costs in this action; (6) such other relief the Court may deem proper. Compl. 11. Another potential bidder on these solicitations, Storage Technology Corporation ("STK") has intervened in this action. STK is wholly owned by Sun Microsystems (SUN").

## Statement Of Facts

### A. Procurement Background

This protest arises out of two parallel procurements for NAVO's MSRC, a High Performance Computer Center operation. AR 153, 186. Although for similar requirements, solicitations 4THG17078068 and 4THG17078067 are separate solicitations for administrative

and accounting reasons. AR 153-54. Solicitation 4THG17078068 includes maintenance of all MSRC systems except those systems identified as Disaster Recovery ("DR") systems and 4THG17078067 includes only maintenance of DR systems. Id. In these solicitations, NAVO seeks a single contractor to provide "hardware/software maintenance support . . . for STK equipment," AR 173, 180, to include preventive maintenance and remedial maintenance for the hardware and software specified, to be provided seven days a week, 24 hours a day with a two hour response time. AR 174, 181. The solicitations covers storage libraries, which are large, silo-type pieces of equipment containing tape drives — accessed with robotic arms and communication devices — used for storing information, and associated equipment. AR 78-80, 157. The covered equipment is manufactured by defendant-intervenor STK and the software that controls the hardware is owned by STK, which originated and designed the software. AR 70, 153.

The requirements set forth in solicitations 4THG17078068 and 4THG17078067 are in support of the MSRC located at NAVO, Stennis Space Center, Mississippi. AR 156. NAVO's MSRC acquires and analyzes global ocean and littoral data to provide specialized, operationally significant products and services for war fighters and civilian, national and international customers. Id. Utilizing airborne, surface and subsurface platforms deployed worldwide, remote-sensing satellites and seaborne buoys, NAVO data are converted into real-time products that are tailored to every warfighter's needs. Id. These products and services support virtually every type of Navy fleet operation by providing mission essential information to warfighters 24 hours-a-day, seven days-a-week. Id. Fifteen percent of the computational cycles provided by the NAVO MSRC are dedicated specifically in support of continuing Navy operations. Id.

Examples of the operational information products the NAVO MSRC provides for the Navy include the output of acoustic models run on a classified system, ocean current direction and speed, temperature, salinity, wave height and direction, wind speed and direction, and relative humidity (icing). AR 188. Many operational databases – including such parameters as ocean depth and bottom type – which support the informational outputs generated for the fleet are also stored on the MSRC's systems. Id.

NAVO also oversees the Naval Ice Center in Washington, D.C., and the Fleet Survey Team at Stennis Space Center. AR 156. NAVO is the largest subordinate command under the Commander, Naval Meteorology and Oceanography Command, which is also located at Stennis Space Center. Id.

The NAVO MSRC is a key part of the High Performance Computing Modernization Program ("HPCMP"), initiated in 1992 in response to congressional direction to modernize the Department of Defense ("DoD") laboratories' high performance computing ("HPC") capabilities. AR 155. The HPCMP provides the supercomputer services, high-speed network communications, and computational science expertise that enables Defense laboratories and test centers to conduct a wide range of research, development, and testing. The HPCMP supports current weapons programs, such as the Joint Strike Fighter, Unmanned Aerial Vehicles, Medium Tactical Vehicles Replacement, and the Javelin Missile program, by enabling the use of innovative materials, advanced design concepts, improved and faster modification programs, higher fidelity simulations, and more efficient tests. Id. Future weapons systems, such as radio frequency weapons, the airborne laser, and the Army's future combat system, benefit from basic

and applied research in plasma physics, turbulence modeling, molecular engineering, high-energy materials, and advanced signal processing conducted by researchers using the HPCMP. Id.

The HPCMP community consists of over 4,550 scientists, engineers, computer specialists, networking specialists, and security experts working throughout the United States. AR 155. All three Military Departments and several Defense Agencies participate in the program. Id. These HPC users execute over 550 projects, validated by the Military Services and Defense Agencies. Id.

MSRCs are very large HPC computational centers designated to provide complete HPC environment, data storage, including a full range of resources including hardware, software, data storage, archiving, visualization, training and enterprise in specific computational technology areas. AR 155. These Centers serve all DoD Services and Agencies without regard to their location or supporting organization. Id. There are four MSRCs, including the one at NAVO, that currently operate large HPC systems available to the entire DoD HPC community. Id.

Thus, in addition to creating products for the daily use of every United States Navy ship, aircraft and submarine, hundreds of researchers nationwide depend daily upon the uninterrupted computing power of the NAVO MSRC. AR 186.

The HPCMP program requires that MSRC systems maintain a 97 percent availability to users, but the NAVO MSRC has maintained a 99+ percent availability since 2003. AR 157.

In addition, the NAVO MSRC serves as the Disaster Recovery Center ("DRC") for five other HPCMP computing centers, including all three of the other MSRC available for DoD-wide usage – the United States Army Research Laboratory at Aberdeen Proving Ground in Maryland, the Aeronautical Systems Center at Wright-Patterson Air Force Base in Ohio, and the United

States Army Corps of Engineers Engineering Research and Development Center in Mississippi – as well as the Arctic Region Supercomputing Center, and the Maui High Performance Computing Center. AR 187. This DRC designation requires the NAVO MSRC to maintain backups of each HPCMP center's data, which it is continuously responsible to provide in the event of a catastrophic data loss at any or all of the five other computing sites. Id. In the event of a catastrophe at any of these other centers, the NAVO MSRC would provide a copy of critical data required to resume operations at the respective center. Id.

The MSRC located at NAVO consists of massively parallel computing engines, multiple TeraBytes – each TeraByte equal to 1000 Gigabytes – of on-line disk storage and Petabyte – each equal to 1000 TeraBytes – scale tape libraries. AR 187. In all, the NAVO MSRC maintains in excess of five Petabytes of data, which number is rapidly growing. Id.

The NAVO MSRC configuration consists of high end multi-processor SUN servers connected to Storage Area Networks of about 60 TeraBytes, each of which is also interfaced to multiple STK Powderhorn tape silos. AR 157, 187. The system includes a mixture of tape drives including 9840, 9840B, and E10K drives. AR 157. These tape silos are controlled by a Library Management Unit connected to an Automated Cartridge System Library Software environment running on another SUN workstation. The entire system runs a file system called SAM-QFS (which is a SUN product). Id.

There are both classified and unclassified resources in a very demanding data storage and archival environment which is constantly being tuned for performance as the MSRC "pushes the envelope" on some of the most modern technology available. Id. To deal with concerns about such cutting-edge operations, the MSRC maintains a test bed of similar, but smaller scale,

equipment to ensure that any changes made to the system are fully tested before being put into a operational environment. Id. The test bed operation is considered essential, because changes made to one part of the system could easily cause problems in that system or other related components. Id.

The MSRC's complex environment consists of hardware, firmware, and software that is constantly maintained and upgraded for both security and performance. AR 157. As indicated by the usage of a test bed system, the NAVO MSRC works very closely with the primary vendor, SUN, and its associated field engineers to ensure that any modifications to this system are carefully planned and fully supported. Id. This is critical to ensure continuity of operations year round including scheduled preventative maintenance periods. Id.

**B. History Of This Procurement**

On August 21, 2006, NAVO issued solicitations 4THG17072001 and 4THG17072002, each seeking both hardware and software maintenance of the STK systems at issue in this protest. AR 153. As with the current solicitations, two separate solicitations were issued for administrative and accounting reasons, solicitation 4THG17072002 for coverage of all non-DR systems and 4THG17072001 for only DR systems. Id.

On August 23, 2006, CHE notified Brandi Barnes of GSA, that it could provide SUN/STK equipment hardware maintenance services under GSA contract GS35F0445K. Id. However, the only source for maintenance of the software was the originator/designer of the software, SUN/STK. Id. CHE requested the requirement be split to allow the submission of quotes for either hardware or software. AR 153. GSA responded initially that, based upon the Government's need for a total solution, the client had requested the hardware and software

maintenance remain together. Id. Moreover, GSA had received replies from seven vendors expressing an interest in providing a quote for a total solution. Id. Therefore, the requirement would remain as stated.

However, when CHE threatened to bring a bid protest, the GSA Contracting Officer ("CO"), Ms. Brenda Spence, asked two Lockheed Martin Space Operations ("LMSO") employees assigned to the NAVO MSRC about the feasibility of splitting the hardware and software maintenance tasks. AR 153, 160, 162. Neither was aware of any "technical reason" that would prevent one vendor providing support of software and another providing support of the hardware. AR 160, 162. Based solely upon these responses, the CO amended the two solicitations to provide for multiple awards. AR 153.

Shortly thereafter, the requests for quotation ("RFQs") closed. Id. The GSA's procurement package was forwarded to the NAVO MSRC client contacts, the Contracting Officer's Representative ("COR"), Pete Gruzinskas, and Robert Knesel, the Deputy Director for the NAVO MSRC. Id. Both contacted the CO to explain that they had been unaware of the changes to the RFQs, and that the comments by LMSO contractor employees did not take into account the operational needs of the NAVO MSRC. Id. The NAVO MSRC personnel explained that the complexity of the MSRC configuration, the challenges of multiple vendor support, the significance of the HPC program to DoD and the impact of any system outages to critical DoD programs and missions all militated against splitting the hardware and software maintenance requirements for the MSRC systems. AR 153-54.

On September 28, 2006, Pete Gruzinskas provided some additional description of the technical requirements and a short memorandum, AR 164, addressing some of the potential

impact to the MSRC should GSA proceed with multiple award strategy. Id. He noted that the systems being maintained represented a tightly integrated collection of hardware, software and firmware which operated as a complete system, that any change to one of these components would have a direct affect on the other components, id., and that the systems are mission critical supporting continuing DoD operations. AR 154.

Based upon the new information provided by the NAVO MSRC client, the CO determined award under solicitations 4THG17072001 and 4THG17072002 would not serve the Government's actual needs. Id. Specifically, she concluded that the solicitations' evaluation approach – "low priced technically acceptable" – and the allowance for a split award greatly increased risk to the MSRC and the users they support. Id. She further concluded that it would not be in the best interest of the Government to separate the hardware and software support, thus increasing the potential for down time. Id. In the judgment of the CO, the required solicitation changes would be so substantial as to exceed what prospective offerors could have reasonably anticipated. Id. Therefore, she determined that the existing solicitations should be canceled and the requirement redefined and resolicited under new numbers, 4THG17078067 and 4THG17078068. Id.

Solicitations 4THG17072001 and 4THG17072002 were cancelled November 14, 2006. Id. Solicitations 4THG17078067 and 4THG17078068 for hardware and software maintenance were issued December 5, 2006. AR 154.

On January 3, 2007, SUN personnel provided GSA Contracting Personnel with the contact information for three authorized resellers of STK hardware and software maintenance. AR 343 (Tab 5).

**C. CHE Protests To The GSA**

On December 7, 2006, CHE protested GSA's decision to re-solicit the NAVO MSRC requirements for hardware and software maintenance seeking a single vendor on each solicitation. AR 191.

CHE asserted that the solicitations unduly restricted competition, because only STK and its owner, SUN, possessed a license for the software needed to operate the robotic tape library system, so that requiring an offeror to provide both hardware and software maintenance limited competition to STK. AR 191-92. CHE also cited eight other procurements for maintenance on STK-made robotic tape libraries in which separate vendors for software and hardware maintenance were allowed for by the solicitations. AR 194. Finally, CHE asserted that the operating system for the robotic tape libraries resided on the mainframe portion of the system, rather than a component of the robotic tape library itself, so the requirement that only one vendor provide software and hardware maintenance would be similar to requiring Microsoft to repair a hardware problem on a Dell computer because the computer used a Microsoft operating system. AR 195.

**D. GSA Denies CHE's Protest**

The GSA denied CHE's protest on January 12, 2007. AR 139. After reviewing the information provided by both parties, GSA concluded that NAVO had met its burden to provide a reasonable basis for its need to receive hardware and software maintenance from a single vendor. AR 142. GSA further concluded that NAVO had shown that its paramount concern in seeking a single vendor was to avoid disruptions in service that would adversely affect its critical missions and those of its customers. Id. GSA continued by noting that NAVO's materials

demonstrated that the critical, high priority research conducted using MSRC archive data and the production of information from that data is essential to Navy fleet operations as well as continuing DoD military operations. Id.

GSA also decided that the record reflected that any delay caused by interruption of service, whether due to "finger[-]pointing" or failure to timely and properly maintain the NAVO MSRC systems, would unduly disrupt the performance of NAVO and other DoD missions. Id. Ultimately, GSA concluded that NAVO's emphasis on reliability of its systems and the ability to provide its services on a continual uninterrupted basis had a direct impact on Navy and DoD mission critical operations. Id. CHE's protest was thus denied. Id.

### E. CHE Sues In This Court

CHE filed suit in this Court on January 24, 2007.

## Argument

## I. NAVO Is Entitled To Judgment On The Administrative Record

### A. CHE Must Prove NAVO Acted Irrationally

#### 1. Rule 52.1 Standards

Under RCFC 52.1, the Court determines whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record. A & D Fire Protection, Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005)). The Court must make fact findings where necessary. Id.

2. **Standard Of Review**

This Court's review of agency procurement decisions is quite limited. The Court possesses jurisdiction to entertain both pre-award and post-award bid protests under the Tucker Act, 28 U.S.C. § 1491(b), as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"). Banknote Corporation of America, Inc. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004). Under the ADRA, the Court applies a standard of review adopted from the Administrative Procedure Act, codified at 5 U.S.C. § 706. Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001). This standard of review provides that a reviewing court shall set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." Id. at 1332 n.5.

In the bid protest context, this Court should enjoin a procurement decision only when "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Impresa Construzioni, 238 F.3d at 1332. When a bidder's challenge implicates the first ground, the protestor "bears a heavy burden" of showing that the agency's decision had no rational basis. Id. at 1333. This heavy burden stems from the wide discretion afforded to contracting officers "upon a broad range of issues confronting them in the procurement process." Id. at 1332. Indeed, this Court will "interfere with the government procurement process 'only in extremely limited circumstances.'" EP Productions, Inc. v. United States, 63 Fed. Cl. 220, 223 (2005) (quoting CACI, Inc.-Federal v. United States, 719 F.2d 1567, 1581 (Fed. Cir. 1983)).

An agency's decision could be found irrational if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to

the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). In evaluating an agency's decision, the Court "is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971). "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). In particular, when the Court considers "a purely factual question within an area of competence of an administrative agency created by Congress . . . the Court will recognize the relevant agency's technical expertise and defer to its analysis unless it is without substantial basis in fact." Fire-Trol Holdings, LLC v. United States, 66 Fed. Cl. 36, 40 (2005) (internal quotes and citations omitted). Nonetheless, an agency's decision is not shielded from a "thorough, probing, in-depth review." Id.

### 3. Solicitation Terms Should Meet An Agency's Minimum Needs

The Competition in Contracting Act ("CICA") imposes upon an agency a duty to "obtain full and open competition." Id. (citing 41 U.S.C. § 253(a)(1)(a)); see also 10 U.S.C § 2304. The Federal Acquisition Regulation ("FAR") specifies that an agency "shall provide for full and open competition through use of the competitive procedure(s) . . . that are best suited to the circumstances of the contract action and consistent with the need to fulfill the Government's requirements efficiently." 48 C.F.R. § 6.101(b). The FAR requires that "restrictive provisions"

be included in solicitations only "to the extent necessary to satisfy the needs of the agency or as authorized by law." 48 C.F.R. § 11.002(a)(1)(ii).

Solicitation terms must thus have a rational relationship with an agency's minimum needs and must not be unduly restrictive. Wit Associates, Inc. v. United States, 62 Fed. Cl. 657, 662 (2004). The determination of an agency's minimum needs "is a matter within the broad discretion of agency officials . . . and is not for this court to second guess." Id. (internal citations omitted). An agency's determination of the "best method of accommodating" its needs also falls within the agency's discretion. United Enterprise & Associates v. United States, 70 Fed. Cl. 1, 26 (2006). A plaintiff bears the burden of proving that a solicitation does not meet an agency's minimum needs. Id. at 662 n.6.

### B. CHE Has Failed To Prove That NAVO Acted Irrationally

CHE must prove that the "bundling" term (1) bears no rational relationship to the agency's minimum needs and (2) is unduly restrictive. See Wit Associations, 62 Fed. Cl. at 662. CHE fails to do this, and our motion for judgment on the administrative record should thus be granted.

#### 1. The "Bundling" Requirement Meets NAVO's Minimum Needs

The administrative record demonstrates, and CHE did not previously contest, that maintaining the equipment involved in this procurement is critical for DoD in both war and peace. E.g., AR 155-56, 188. For example, 15 percent of the computational cycles provided by the NAVO MSRC are dedicated to continuing Navy operations. AR 156. NAVO provides mission essential information to war-fighters in submarines, surface ships and Naval aircraft worldwide. Id. Up-to-date data such as ocean current speed and direction, wave height and

direction, wind speed and direction, relative humidity, and classified outputs from acoustic models, all seem vital, in varying degrees, to operating surface ships, submarines and Naval aircraft. AR 188. The continuing research projects on the HPCMP system are vital to the current and future improvement of our Armed Forces' equipment and operations. AR 155. Moreover, the DRC function of NAVO makes it uniquely important to the HPCMP program, in which a catastrophe at another of the five HPCMP centers would cause continuing operations at that center to grind to a halt until such time as NAVO could restore its database. AR 187. Because of the criticality of this computing equipment, NAVO needs assurance that the equipment will be maintained and repaired quickly and seamlessly, without any "finger-pointing" or other disputes between software and hardware vendors about the source of a problem.

A high level of maintenance service, both software and hardware, is NAVO's minimum need, and the "bundling" term in its solicitations is rationally related to that need. The agency has offered numerous reasons for the inclusion of the "bundling" term. AR 153-58, 186-89. CHE's complaint and prior agency-level protest suggest only two arguments for this term being irrational: (1) a number of other agencies have allowed separate vendors for software and hardware maintenance; and (2) the fact that the operating system for the robotic libraries is located on a computer outside the robotic tape library renders the "bundling" requirement irrational, in that this is purportedly similar to requiring Microsoft to repair hardware problems on a Dell computer, solely because a Microsoft operating system is on the computer. AR 194-95; Compl. 4-5. Neither argument is valid.

CHE's protest cited eight solicitations for STK tape library maintenance services, in which the solicitations purportedly allowed for provision of hardware and software by different

vendors. AR 194. In its complaint, CHE cites 16 such contracts. Compl. 4-5. However, a quick perusal of the two lists indicates that virtually all of the systems listed appear to be for more routine, while still important, uses, such as financial and personnel records processing, inductee processing, immigration records processing, supply management and medical records processing. AR 194, Compl. 4-5. While a small number of these may be related to continuing military operations, especially those related to the Defense Information Systems Agency ("DISA"), none appear likely to involve both daily operational war-fighting tasks and supercomputer-based research capabilities. Id. Moreover, in a recent decision, CHE Consulting, Inc. v. United States, ___ Fed. Cl. ___, 2006 WL 3746676 (Dec. 15, 2006), this Court upheld a DISA requirement that the maintenance contractor be able to show it could obtain Original Equipment Manufacturer ("OEM") support without intervention of the Government. DISA's requirement casts doubt upon CHE's suggestion that other agencies have no concerns about splitting the responsibility for maintaining and repairing these robotic tape libraries. Furthermore, none of these other solicitations appear likely to relate to a facility designated as the DRC for all the supercomputing centers available for use DoD-wide, nor do any appear likely to maintain a test-bed to ensure changes are tested before being implemented in the operational and high-end research systems. See AR 194, Compl. 4-5. As a final point, none of these computer systems appear to be of the highly complex supercomputer variant, as none of the HPCMP computing centers appear to be on the CHE list. Id.

CHE's assertions with regard to the location of the operating system for the robotic libraries on a computer outside of the robotic tape library being somehow similar to requiring Microsoft to repair hardware problems on a Dell computer, solely because a Microsoft operating

system is on the computer, also lack validity. AR 194-95. Indeed, as the requiring activity's contact, Mr. Gruzinskas, noted, the systems being maintained represented a tightly integrated collection of hardware, software and firmware which operate as a complete system and any change to one of these components would have a direct affect on the other components, AR 164. The existence of a test-bed fully evidences the seriousness of the Government's concerns in this area. While the Government does not dispute that some amount could potentially be saved by splitting the maintenance requirements, the risks of any outage to the system, to the Navy war-fighters, and to the leading edge research being conducted would appear to be of far greater magnitude than the potential cost savings.

Moreover, the parallel suggested by CHE is misleading. While the entire system of supercomputers storing data in and controlling robotic tape libraries could be compared in functioning to a computer, the agency's position does not suggest that the software writer (Microsoft in the example) is the only source of hardware maintenance on a computer made by another (Dell in the example). Instead, by extension, the agency's position is that where a very complex, very important computer is involved, it is not desirable to have a problem of unknown origin and have to sequentially call two different vendors, potentially getting in each other's way, to examine the problem to determine if it was within their maintenance responsibility or that of the other vendor's, with neither's contract providing the opportunity for a total solution. The agency's concerns are clearly rational.

While CHE asserts that no real risks arise from splitting the requirements here, this self-serving statement amounts to nothing more than evidence of "mere disagreements with the contracting officer's assessment of the risks associated with its proposal." <u>International</u>

Outsourcing Services, L.L.C. v. United States, 69 Fed. Cl. 40, 49 (2005). Such "naked claims" fall far short of meeting CHE's burden of demonstrating that NAVO's opinion is irrational. Id.

This Court defers to an agency's judgment unless a protestor overcomes its "heavy burden" to show that it is irrational. Banknote, 365 F.3d at 1351. CHE has failed in this regard; in no way has it shown the agency's decision here is irrational. That decision must therefore be upheld.

**2. The "Bundling" Requirement Is Not Unduly Restrictive**

SUN has supplied NAVO with the contact information for three authorized resellers of SUN/STK hardware and software. AR 343 (Tab 5). Before the previous requirement was changed to allow splitting into multiple awards, seven vendors had expressed interest in the combined maintenance package. AR 153. Currently, the three resellers and SUN/STK can provide the combined maintenance specified, so adequate competition is available. The "bundling" requirement is not unduly restrictive; it merely meets the agency's minimum needs, and it should be upheld. Given the very real risks the agency perceives, the "bundling" requirement, in the judgment of the agency, is the best way to manage this risk, and the agency's judgment should not be disturbed.

At root, CHE's complaint stems from its dispute with STK, not with the agency. That dispute is at least six years old. See CHE Consulting, Inc. v. United States, 47 Fed. Cl. 331 (2000); see also CHE Consulting, 2006 WL 3746676. It resulted in a lawsuit filed in 2002 by STK alleging "secret misappropriation, patent infringement, false advertising, and various state law claims." Storage Technology Corp. v. Custom Hardware Engineering & Consulting, Ltd., 2006 WL 1766434, 1 (D. Mass. June 28, 2006). The suit was still pending as of June 2006. Id.

at 37. This dispute was not caused by the Government, and the Government should not be forced to sacrifice its requirements to accommodate CHE's limitations because of it. Furthermore, while not cited by the agency, the extended litigation between the two entities raises the potential risks of "finger-pointing."

NAVO has a large inventory of STK equipment operated by SUN/STK software, and its minimum needs dictate that this equipment be maintained by someone who can analyze and resolve either hardware or software problems. Had it so chosen, the agency could have procured maintenance services on a sole-source basis and simply awarded the contract to STK. See 10 U.S.C. § 2304 (c)(1) ("the property or services needed by the agency are available from only one responsible source or only from a limited number of responsible sources and no other type of property or services will satisfy the needs of the agency."). Instead, the agency chose to open this contract to competition by any vendor who could address both software and hardware maintenance issues, which would include STK and resellers of STK software and hardware maintenance services such as the three identified by SUN. AR 343. This compromise complies with the letter and spirit of CICA, while also satisfying the agency's minimum needs.

CICA does not impose upon an agency a competition-at-all-costs requirement. Instead, CICA requires an agency to "use the competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement." 41 U.S.C. § 253(1)(B). The circumstances of this procurement require that the agency contract with vendors capable of assuring the agency that they can address both hardware and software issues if needed. The agency has structured this procurement to obtain competition within this reasonable parameter, and it has satisfied CICA's command in doing so.

### C. CHE Is Not Entitled To Injunctive Relief

CHE's request for a permanent injunction should also be denied. We have demonstrated that CHE's previously asserted arguments lack merit, and CHE has also failed to show it is otherwise entitled to injunctive relief. In deciding whether a permanent injunction should issue, a court considers: "(1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief." PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citing Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 546 n. 12 (1987)).

Because "injunctive relief is so drastic in nature, a plaintiff must demonstrate that its right to such relief is clear." EP Productions, Inc. v. United States, 63 Fed. Cl. 220, 224 (2005). That is, CHE must demonstrate its right to injunctive relief by clear and convincing evidence. KSEND v. United States, 69 Fed. Cl. 103, 112 (2005). Further, the Tucker Act directs this Court to "give due regard to the interests of national defense and national security and the need for expeditious resolution of the action" when deciding bid protests. 28 U.S.C. § 1491(b)(3). A solicitation that "addresses military preparedness implicates national security, which, thus, becomes a factor the court must consider in the balance of harms." Avtel Services, Inc. v. United States, 70 Fed. Cl. 173, 228 (2006).

CHE is correct that, if it were wrongfully denied the right to compete for DISA's contract, it would have suffered irreparable harm. Blue & Gold Fleet, LP v. United States, 70 Fed. Cl. 487, 514 (2006). But CHE was not wrongfully denied that right, as we show above, and so the

harm to the agency of providing CHE the injunctive relief it requests outweighs any harm to CHE here. Id. Further, the Court should give due regard to national security in this protest, recognizing that CHE's request that the agency modify its RFQ to suit CHE's tastes would affect NAVO's ability to maintain storage equipment involved in continuing wartime operations and critical defense-related research. For this reason, both the third and fourth prongs of the injunctive relief test weigh in the agency's favor.

In short, CHE has failed to show by clear and convincing evidence that it is entitled to injunctive relief in this case.

## CONCLUSION

For the foregoing reasons, this Court should grant our motion for judgment on the administrative record and deny CHE's request for permanent injunction.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Acting Director

s/Brian M. Simkin
BRIAN M. SIMKIN
Assistant Director

**Agreed-Upon Redacted Copy - May Be Made Public**

s/F. Jefferson Hughes
F. JEFFERSON HUGHES
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-3067
Fax: (202) 514-8640

OF COUNSEL:
ANDREW SINN, ESQ.
Assistant Regional Counsel
U.S. GSA Office of Regional Counsel (4L)
77 Forsyth St., Suite 600
Atlanta, GA 30303
Tel: (404) 331-1535
Fax: (404) 331-1231

Dated: February 16, 2007

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 28th day of February, 2007, a copy of the foregoing Agreed Upon Redacted Copy of "DEFENDANT'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ F. Jefferson Hughes