**PENDING BEFORE THE GSA**

| | | |
|---|---|---|
| Protest of: | ) | |
| | ) | |
| CHE Consulting, Inc. for | ) | |
| | ) | Agency Level Protest |
| STK HW/SW Maintenance | ) | |
| Task Orders 4THG17078068 | ) | |
| (MSRC) and 4THG17078067 | ) | |
| (DR) | ) | |

**CHE'S REPLY BRIEF**

CHE Consulting, Inc. hereby files its reply in support of its original protest. Attached hereto is the affidavit of Mr. David York, who is the President and CEO of CHE. He addresses many of the technical issues raised by the Contracting Officer on behalf of NAVO in her Statement of Facts memorandum.

**Introduction**

"But that's the way we've always done it." When one cuts through the clutter, that phrase represents NAVO's ultimate justification for restricting competition. As Mr. Gruzinskas stated: "NAVO MSRC has always covered these systems under one contract with a single vendor."[1] How then, one must wonder, can Mr. Gruzinskas go on to state that the government would not receive the same "quality of service" if the software and hardware maintenance services were de-bundled? What is he basing this conclusion on if NAVO has never had separate vendors perform these two separate maintenance services?

The fact of the matter is that Mr. Gruzinskas and NAVO (through the Contracting Officer) have provided absolutely no evidence – of any kind – whatsoever that having separate maintenance vendors for software and hardware would lead to a disruption of

[1] Mr. Gruzinskas' e-mail was Enclosure 3 to the Contracting Officer's Statement of Facts. It should also be noted that the GSA's legal memorandum refers to Mr. Gruzinskas' e-mail as an affidavit. See Legal Memo, p. 6. It is not, as Mr. Gruzinskas did not attest to his statements made in his e-mail under oath.



12/29/2006 16:38 6182345594 THE KELLOGG LAW FIRM PAGE 02/20

services. Such assertions are entirely speculative and, since NAVO has always bundled these services, they are not based upon past empirical experiences.

As clearly and convincingly demonstrated by Mr. York in his attached affidavit, just some simple market research by NAVO will reveal that its fellow federal agencies – which are under the auspices of the DoD – have learned that the emergence of independent service organizations, like CHE, have eliminated the need to bundle hardware and software maintenance services.

There is indeed a viable competitive alternative that not only improves pricing, but also performance. And the concern of service disruptions by having two, as opposed to one vendor, is nothing more than just a myth created by those who wished to retain their monopolistic control over this sector of the industry. We urge the GSA to reconsider its earlier decision, conduct relevant market research, and ultimately opt for competition, which will not be in the interests of NAVO, but also the American taxpayer.[2]

## The Legal Standard

As we stated in our original protest, the Competition in Contracting Act ("CICA") only permits an agency to include specifications which restrict competition if such restrictions are necessary to satisfy the agency's minimum needs. 41 U.S.C. § 253(a)(2)(B); 10 U.S.C. § 2305(a)(1)(B)(ii). And since bundling tends to restrict competition, as it clearly does in this case, NAVO must prove that combining these

---

[2] It is also interesting to note that the GSA's Special Identification Numbers (SIN) for these services are segregated. For example, SIN 132-12 is for computer equipment maintenance. SIN 132-34, on the other hand, is for computer software maintenance services. If these two services were truly a single service that could only be performed by a single vendor, then why the two SINs? Why not one SIN for all such services?



12/29/2006 16:38 6182345594 THE KELLOGG LAW FIRM PAGE 03/20

services in this case is necessary to satisfy its minimum needs. See CHE Initial Protest, pp. 2-3.

We cited to the National Customer Engineering case where the GAO sustained the protest finding that the bundling of software and hardware maintenance services, as NAVO attempts to do here, violated CICA. 93-1 CPD ¶ 225. The GSA attempts to distinguish this decision by claiming, without support, that the Department of Interior's need for uninterrupted services was somehow inferior to that of NAVO. Of course nothing in the National decision supports such rampant speculation.

In any event, the reason the GAO's decision in National is relevant is not because of the work that agency did, but in the excuses provided by the agency to support its decision to bundle. In National, the agency first tried to justify its bundling decision claiming that excessive finger pointing could lead to processing disruptions. Said the agency:

> [I]t often becomes impossible to determine which vendor's service is at fault and they blame each other for problems. This requires the Government to attempt to determine whether the problem is a software or hardware problem.

Id.

Sound familiar? It should, because in this case, the GSA set forth a remarkably similar justification: "GSA asserts that the NAVO requirement for bundling maintenance requirements with concern over establishing a single order to alleviate the burden on NAVO to settle finger pointing disputes is reasonable . . .." See GSA Legal Memo, p. 5; and Contracting Officer Statement, p. 6.

In addition to the finger pointing issue, the agency in National also advanced this argument: "the hardware and software are designed to function together as one system, so that any malfunction could implicate either." National, 93-1 CPD ¶ 225.

This too should have a familiar ring because Mr. Gruzinskas made precisely the same argument in his e-mail to Ms. Spence: "These systems represent a tightly integrated collection of hardware, software, and firmware which operates as a complete system. Any change to one of these components has a direct effect on the other components."

But the GAO rejected these same justifications in its National decision. Why? Not because the Department of Interior was somehow inferior to NOVA. Rather, it was because the agency simply failed to provide examples of how finger pointing could lead to processing disruptions. Stated differently, the agency's justifications for bundling were at best speculative.

> After reviewing the agency report, in which [the agency] cited "frequently experienced" difficulties when hardware and software maintenance is handed by separate contractors, our Office specifically asked [the agency] whether it, or any entity within the Department of the Interior, had actually experienced problems arising due to blame-shifting between hardware and software maintenance contractors. In response, the agency cited two examples, neither of which involved hardware and software maintenance contractors . . .. ***[The agency's] response strongly suggests that the agency has no record of problems caused by separation of maintenance work between hardware and software maintenance firms.***

Id. (emphasis added).

This is similar to the GAO's decision in Pemco Aeroplex, Inc., B-280397, 98-2 CPD ¶ 79. There, the agency sought to bundle aircraft maintenance with maintenance of hydraulic components, electrical accessories and flight instrumentation. Id. Like NAVO does here, the agency sought to justify the bundling on the basis that having two vendors,





12/29/2006 16:38 6182345594 THE KELLOGG LAW FIRM PAGE 05/20

as opposed to one, could jeopardize the readiness of our armed forces. Id. And like NAVO, the agency in Pemco failed to document credible of instances where readiness had in fact been compromised because the agency was not dealing with just a single vendor. Id. In sustaining the protest, the GAO held:

> In sum, while our Office will show deference to agency claims that requirements of military readiness supports a combination of workload requirements . . . ***such claims must be properly documented and reasonably related to the workload combination***. Here . . . the Air Force has not shown that readiness requires bundling those workloads, despite extensive opportunities to do so.

Id.

The lesson of these GAO decisions is that an agency cannot simply state, without documentation or support, that disruptions in service will occur if separate vendors maintain the hardware and software. There must be something more – namely evidence of such concerns. After all, the principles of competition cannot be cast aside by merely uttering key phrases without the underlying support to back up such assertions. But that is precisely what NAVO has done in this case. It has provided no evidence whatsoever that de-bundling these requirements will lead to downtime. That is why CHE's protest must be sustained.

**The Market Place**

In our original protest, we noted 8 examples of recent federal procurements that did not require the hardware and software vendor to be the same contractor for SUN/STK robotic tape library equipment. The GSA tries to argue that these systems may be less critical than NAVO's mission, thus allowing for separate vendors. Rather than repeat what is in his affidavit, we direct you to paragraphs 9 through 18 of Mr. York's attached paragraphs. Not only are CHE's other federal government clients just as sophisticated as



12/29/2006 16:38 6182345594 THE KELLOGG LAW FIRM PAGE 06/20

NAVO, in many respects, their missions are even more critical on an every day basis to the warfighter.[3] And even though in each and every one of these contracts, CHE does not provide software maintenance support, CHE has maintained a system availability rate for its SUN/STK robotic tape library customers of 99.7%.

Clearly, NAVO has not conducted sufficient market research to determine for itself whether these requirements can be segregated. We know that once it does, it will find, as CHE's other DoD customers have learned, that concerns over downtime and finger pointing are nothing more than myths.

**Conclusion**

Based upon CHE's original protest, Mr. York's attached affidavit, and this legal memorandum, CHE respectfully requests that the GSA sustain this protest and promote, rather than restrict, competition.

Respectfully submitted,

THE KELLOGG LAW FIRM

By________________________
Steven E. Kellogg

[3] In her Statement of Facts, the Contracting Officer confirms that only 15% of the computation cycles provided by NAVO are dedicated specifically in support of ongoing Navy operations. Thus, one can infer that the other 85% is not directly dedicated to the day-to-day needs of the warfighter.

**AFFIDAVIT OF DAVID YORK**

I, David York, being first duly sworn upon my oath, state as follows:

1. I am the President and Chief Executive Officer of CHE Consulting, Inc. and am competent to testify to the matters herein. My testimony is based upon personal knowledge of the facts set forth in this affidavit.

**The Market Place**

2. Prior to CHE's entry into the market place, it was fairly common for the industry to bundle hardware and software maintenance services for StorageTek robotic tape library systems into one package. After all, only StorageTek ("STK") as the Original Equipment Manufacturer ("OEM"), which is now a subsidiary of Sun Microsystems, had the technical capability of performing maintenance on the robotic tape library system itself – which is considered the hardware in this procurement.

3. CHE changed all of that by providing high quality maintenance support to such systems at a fraction of the cost that had been the norm in this industry before a viable competitor, like CHE, entered the market.

4. CHE currently maintains 75 hardware maintenance service contracts across 201 locations within the United States, and 4 contracts in foreign countries. In fact, CHE's total STK robotic tape library maintenance portfolio makes up approximately 12% of the entire market segment within the U.S. And that has been achieved in only 10 short years of existence.

5. Out of this total, not one customer in one location bundles the operating system software licensing and service with that of the hardware maintenance service. Such government customers include:



12/29/2006 16:38 6182345594 THE KELLOGG LAW FIRM PAGE 08/20

- Defense Enterprise Computing Centers (DECC) for the Defense Information Systems Agency (DISA) supporting all Department of Defense (DOD) branches;
- Defense Logistics Agency (DLA) (5 locations across the U.S.);
- Air Force Climatology Control Center (AFCCC);
- Bureau of the Public Debt (BPD);
- Office of the U.S. Courts;
- Department of Justice;
- Enlisted Evaluation Records Center (EREC) Department of the Army;
- Department of Immigration & Naturalization (Homeland Security);
- Naval Medical Management Center;
- Naval Post Graduate School;
- North Carolina Department of Treasury;
- NOAA The National Weather Service;
- Integrated Personnel Enlisted Records Management System (iPERMS) Department of the Army;
- Personnel Enlisted Systems Agency Department of the Army;
- United States Military Entrance Processing Command (USMEPCOM);
- United States Postal Service;

6. In addition to these governmental entities, CHE also performs hardware maintenance services on SUN/STK robotic tape library systems for the following educational and private sector entities: ABN AMRO (Swiss Bank based in 4 locations across the U.S.); Affiliated Computer Services (ACS) (Multi-vendor Services outsourcer of computer processing services for Major Health Insurance, Credit Cards, Department

Stores and many more across 5 major U.S. cities and many satellite processing centers); Associated Wholesale Grocers; AT&T; BJC Healthcare; CEC (Chuck E Cheese) Entertainment Concepts; Cendant; Central Missouri State University; Certegy; Children's Hospital of Philadelphia; City of Tampa; Colorado Satellite Broadcasting; Compu-Fix; Computer Science Corporation (CSC) (9 locations across the U.S.); Confident Software; Consumers Energy (Michigan Utility); Contra Costa County; CSC Sweden; Delta Faucet; Disney (Walt Disney World & Disney Entertainment); Dollar Bank; E-Media Plus; Equifax; Georgia Institute of Technology (Georgia Tech); GC Services; General Electric (GE); General Life Reassurance Company; Honeywell (22 processing satellite centers across the U.S.); International Business Machine Corporation (IBM); Indiana University; ING; Integrasys; Jeppesen Sanderson; Lotus; MCI; Medical Center of Central Georgia; Missouri State University; Monroe County; Neuberger, Lehman, and Berman (American Express Financial); Northrop Grumman; Optica Technologies; Petroleum Geo Services; Prodata Systems, Inc.; San Diego Super Computer (Carnegie Mellon Institute); SCB Computer; SEB Sweden (SAAB); Southern Union; Specialty Retailers; St. Josephs Medical Center; State of Florida Banking and Finance; Telestra (Australia Phone Utility); Tenneco Automotive; The Dallas Morning News; Unified Western Grocers; Unity School; University of Northern Colorado; University of Wisconsin; University of Missouri; University of Tennessee; University of Texas; U.S. Trust Company of New Jersey; Washington Headquarters Services (WHS in support of the President); WE Energies; Western Geco; and XCEL Energy.

7. As stated previously, prior to CHE's entry into the market place 10 years ago, each of CHE's current clients did as NAVO seeks to do now: procured hardware

and software maintenance services from a single vendor. But CHE's emergence has ended the OEM's monopoly and has provided extraordinary savings, as well as enhanced support services, to its customers. Indeed, even Mr. Gruzinskas' e-mail (enclosure 3 to CO's Statement of Facts) specifically acknowledges the cost savings inherent in de-bundling the procurement ("Although on the surface some bids may appear to represent a savings to the government for a single component of the complete system (say hardware) . . . .").

8. As these government and private clients have learned, competition not only lowers prices, but it also improves services. NAVO appears to be taking the position that "we've always done it that way, so we'll continue to do it that way." If Mr. Gruzinskas would be willing to perform just a little market research on the subject by calling some of his fellow federal employees, he will understand what they have come to learn through experience, that concerns over finger pointing and down time for this specific industry are nothing more than myths.

**<u>NAVO's Processing Capabilities and Service Needs are not Unique</u>**

9. GSA counsel and the Contracting Officer try to make the point that CHE's other contracts are somehow less sophisticated and perhaps less demanding than what would be required under the NAVO procurement. They also infer that CHE may have underestimated the complexity of NAVO's system. Nothing could be further from the truth.

10. Like NAVO, all of aforementioned CHE customers require services 7 days per week, 24 hours per day. In addition, each customer requires a response time to a remedial maintenance service request from a minimum of 2 hours to a maximum of 4





12/29/2006 16:38 6182345594 THE KELLOGG LAW FIRM PAGE 11/20

hours. Moreover, each of these customers requires equipment restoration in a specified period of time.

11. With respect to our U.S. government customers listed above, each of them, like NAVO, process both classified and unclassified data and require security clearances of our personnel ranging from Secret to Top Secret. And like NAVO, each of these customers must have "the ability to provide services on an uninterrupted basis which is critical" whether Federal Government, State Government, or commercial industry.

12. In terms of complexity of systems, NAVO's set up pales in comparison to CHE's DoD customer DISA. CHE, under its hardware maintenance purview at DISA which, by the way, supports all war fighters across every branch of every service, services massive parallel computing engines which provide 17,048 Million Instructions per Second (MIPS) super computing processing power which is comprised of in excess of 35 mainframe subsystems located in three states in the United States; these locations are Ogden, Utah, Mechanicsburg, Pennsylvania, and St. Louis, Missouri.

13. This represents the largest computing power in support of DoD which reports directly to the Secretary of Defense in this nation. It is interesting to note that no measure of the storage subsystems was mentioned with any level of specificity in the GSA's response. Once again, however, to prove that one account of the 8 we listed in our initial protest is superior in complexity and that NAVO MSRC is not unique as it relates to the sophistication of hardware equipment, please consider how much on line disk storage CHE maintains on behalf of DISA in support of all of our nation's war fighters across every branch of service and that is 10.5 Terabytes of on line disk storage.



12/29/2006 16:38 6182345594 THE KELLOGG LAW FIRM PAGE 12/20

14. GSA's response next attempts to create the appearance of uniqueness by referring to its "Petabyte scale tape libraries". While it is impressive that NAVO has an install base of 12 total 9310 SUN/STK robotic tape libraries between the two processing centers (9 in 4THG17078068 and 3 in 4THG17078067), it pales in comparison to the total portfolio of the same products that CHE currently maintains under a hardware maintenance service agreement with our company.

15. For example, NAVO has a total tape potential of 72,000 individual tapes (6,000 tapes per complex maximum potential) and a storage capacity for each of those tapes of 200GB native mode without compression based upon the tape drive type that is installed within the robotic tape libraries which are 9940B and 9840C thus equating to 14,400,000GB which is 14062.5 Terabytes or 13.73 Petabytes.

16. CHE, on the other hand, has 201 total 9310 SUN/STK robotic tape libraries which therefore have a total tape potential of 1,206,000 individual tapes (6,000 tapes per complex maximum potential) and factoring a storage capacity for each of those tapes like at NAVO of 200GB native mode without compression based upon the tape drive type that is installed at NAVO of 9940B and 9840C thus equating to 241,200,000GB which is 235,546.87 Terabytes or 230.03 Petabytes.

17. As clearly reflected above, CHE performs maintenance on DoD SUN/STK robotic tape library systems that are far more expansive and complex than the system to be maintained at NAVO under the current procurement. And it does so on a 24 hour a day, 7 days a week basis, with a 2 hour remedial maintenance response time. But unlike NAVO, DISA does not bundle hardware and software maintenance services – even though it too supports the warfighter.

**The Fear of Extended Outages and Finger Pointing are Myths**

18. Since 2001, CHE SUN/STK equipment customers have enjoyed a 99.7% machine availability rate. That is clearly in line with the Agency's claimed 99+% system availability rate. But the important consideration, at least with respect to this procurement, is the fact that CHE's near perfect systems availability rate has been accomplished even though a vendor other than CHE was responsible for the software maintenance.

19. In order to capture our 12% market share in such a short period of time, we have successfully dispelled the myth of equipment downtime and fears of finger pointing by creating a service delivery infrastructure that is unmatched by any of our competitors. Here is but a sample of what CHE does to ensure that downtime and finger pointing do not occur even though CHE does not maintain the software side.

a. CHE insures that all technicians are certified to deliver all aspects of hardware maintenance service for every piece of equipment that is placed under our maintenance purview for a particular customer. This includes but is not limited to insuring that each technician has all training; test equipment; support tools; parts and technical materials to perform the services; as well as access to all company developed software that directly supports the hardware via the World Wide Web. CHE technicians must be well versed in the hardware's interaction with the software operating system software and must be able to aid our customers in the proper configuration; utilization; restoration; and operating functionality of the software in concert with the hardware. Even though this level of support is provided to support the interaction of the software operating system with the hardware; CHE cannot offer for sale a license for that which it did not create.

b. CHE insures that the parts necessary to effect repair in a remedial maintenance service situation are placed on site (if granted storage space by the client; or stocked at a stocking location in close proximity to the clients data processing center if space is not available) at levels in excess of 90%. This service approach is different than that of the OEM who prefers to depot parts in different locations throughout the country rather than dedicating the parts to their customers.

c. CHE has dedicated 2nd and 3rd level product specialists to support on site technicians when the technician is confronted with a problem that is out of the norm. These individuals are available and accessible to the on site technician 24 hours per day. 2nd level support personnel have knowledge of the equipment that is superior to that of the on site technician and have experience in guiding repairing actions for equipment malfunctions that have rarely occurred in the market place. 3rd level support personnel have knowledge of the equipment that is superior to both the on site technician and the 2nd level support specialist and are able to guide repair actions for those problems that are usually only confronted by design engineers.

d. A technician manned 24 hour customer service help desk to not only receive requests for service from our customers but to also guide the customer in proper recovery procedures for the hardware in the event of catastrophic equipment outages. These personnel are also responsible for insuring that the dedicated CHE technicians meet their response time and repair time obligations for our customers. Escalation for a non responsive CHE technician as it relates to response time starts at the 10 minute mark and at every 10 minute interval and includes the technicians Regional Manager; Director of Operations; and if necessary up to the President of CHE. The same escalation path is instituted for failure to diagnose and repair a hardware unit placed under our maintenance purview starting at the 2 hour time mark after arrival on site and at each one hour increment until repair is completed and includes the Regional Manager; 2nd Level Product Specialist; 3rd Level Product Specialist; Director of Operations; and if necessary up to the President of CHE. It is important to note that each customer escalation path is based upon contractual obligations as well as processing mission.

e. CHE has independently developed; copyrighted; and trademarked the following SUN/STK equipment support tools. These support tools make CHE services superior to that of the OEM or any other competitor because it allows our services to be predictive; proactive; and preventive versus just reactive. CHE customers are paying for equipment availability as close to 100% as is technically possible; since the implementation of these tools in Calendar Year 2001; CHE SUN/STK equipment customers enjoy a 99.7% machine availability rate.

   i. Enhanced Library Event Manager (ELEM) – This support tool provides robotic tape library error data reporting via the Internet in real time to the CHE National Support Center server located in Tucson, Arizona. Connection of this support tool is via either dial up or Ethernet backbone and is provided at no additional charge for our customers.

ii. Tape Diagnostic Tool (TDT) – This support tool provides the interpretation of the real time error data received from ELEM. This tool via the Internet provides technicians; 2nd level support specialists; 3rd level support specialists; Regional Managers; Director of Operations; and Executive Management with; system status, error events, temporary error conditions, and permanent error conditions. It also analyses any error taking place within the systems and recommends proper corrective action to alleviate any level of equipment malfunction.

iii. Site Account Manager (SAM) – This Web based support tool provides the technician as well as every member of management what equipment has been placed under a maintenance contract with our company, the serial number and location of each piece of equipment; the number of service requests received from our customers and support tools for any piece of equipment; the history of the repair actions taken on any piece of equipment; points of contact at the customer location to include each shift supervisor and their management escalation path; and an automated equipment preventive maintenance program regimen based upon a trend line analysis of all equipment being maintained by our company over a minimum 5 year period. Closing of service calls as well as reordering of parts takes place from this program.

iv. Parts Account Management System (PAMS) – This Web based support tool manages all aspects of our parts inventory to support our customers. This includes the company's main logistics depots which are located in Fenton, Missouri; Tucson, Arizona; and Atlanta, Georgia as well as the parts inventories that are located at every CHE client account. This program tracks parts usage for each customer on every piece of equipment we maintain. This program insures that our parts stocking level at each customer account does not go below 90% of the critical spare parts necessary to affect repair in a remedial maintenance service situation.

v. Error Data Reporting System (ERDS) - This independently developed Web based tool provides analysis of all tape units that interface with the host (central processing unit) system. The programs primary focus is OBR as well as NBR error data which is received at the host system from the tape units. The program analyzes these error data sets and provides via e-mail to our customers; those tape units that are experiencing temporary or permanent error conditions that in the future could possibly impact a processing mission. This allows both the customer and CHE to schedule time to resolve the tape unit issue prior to a catastrophic

failure as a preventive maintenance measure. The program also analyzes the tape media being utilized by our customers and provides an e-mail to our customers tape librarians of those physical tapes that need to be removed from the tape libraries which will cause data processing jobs to abend.

vi. Field Engineering Dispatch-Auto Alert System (FED-AA) – This independently developed tool is our dispatch program where service calls are received by our Customer Service Help Desk for CHE clients. This program interfaces with SAM and provides instant verification of equipment that is under contract with our company. It also provides information as to who the primary technician is; who the manager is; who the product specialist is; and what our response as well as repair time obligations are for each piece of equipment under contract with our company. The program also has functionality built in to interface with TDT which automatically initiates a service request without customer interaction for any critical error received from ELEM. In most cases it is CHE who calls our customers to notify them they have an error occurring on robotic tape library equipment before they even know that there is a problem with the equipment. Our customer service help desk in advance lets our customers know what time the technician will be there and what part will require replacing. This is proactive service and is also what separates our company from the OEM reactive service approach.

f. CHE as a matter of company policy does not permit finger pointing when performing services in a mixed vendor environment. CHE presents facts of any service event and will not allow our technicians to leave a site until the entire situation with the equipment is resolved whether the problem is with our equipment or not. As a matter of fact CHE technicians routinely work with other service providers who may have contracts to support other hardware devices or software packages that interface with equipment that has been placed under a maintenance contract with our company. CHE in our ten year history has only had two problems which required interaction with the SUN/STK robotic tape library software provider; one was at ING in 2004 and the other was at Cendant also in 2004. In both of these instances CHE had identified a problem in the software operating system version of ACSLS and HSC. Each of these customers; like all of our customers; pays their license and software support fees under separate contract with the OEM. The CHE technician worked on site via the telephone (just like an OEM technician) with the OEM programmer to resolve the situation on behalf of the customer. CHE also had a bridge call with our second and third level support specialists as well as the regional manager of the account with the OEM programmer. CHE performed every step the OEM programmer asked for to verify hardware

functionality (important to note that the OEM programmer was in Australia not Colorado or California) and then made modifications to the software operating system package per the instructions of the OEM. There was no extended outage in either of these instances and these customers received quality services from both providers.

g. CHE based upon an agreement established with SUN/STK on November 30, 2006 is capable for all products currently being manufactured or that have been manufactured in times past able to provide our customers with microcode, microcode updates, engineering changes, and firmware updates. All of these items are actually software that allows the robotic tape libraries, library management units, library control units, disk control units, and disk units to function and interoperate with the host (central processing unit) operating system software such as ACSLS, HSC, or Santricity.

20. As noted above, CHE provides a 99.7% system availability rate to its customers, even though it does not maintain the software. Simple market research by NAVO will confirm that its fears of having two, as opposed to one vendor, are completely and utterly unfounded. It will also learn that it does not have to pay exorbitant fees to have such equipment maintained in excellent working order.

**GSA's Understanding of Small Resellers is Misguided**

21. In its "Other Considerations" section, GSA wrote the following: "It is GSA's understanding that SUN/StorageTek has agreements with other small business resellers (Marzik & GMRI) that allows them to offer both hardware and software." This statement creates the perception that either of these company's can provide or offer hardware maintenance service or software operating system licensing and service to anyone without restriction. This is not the case.

22. The owner of Marzik, Mr. Brad Willcockson, is a friend of mine, so I called him to determine if the GSA's understanding was accurate. It was not. According to Mr. Willcockson, neither Marzik nor GMRI were allowed to solicit or market

hardware maintenance services stand alone or software operating system software licensing and support stand alone. As a matter of fact the only time Marzik or GMRI can resell maintenance or software is if the customer or end user is purchasing SUN/STK equipment and the customer desires enhanced maintenance services over the equipments standard warranty offered by SUN/STK and the software is necessary as part of the equipment being purchased.

23. Put another way, Marzik and GMRI are an equipment reseller to the government of SUN/STK equipment and not a reseller of maintenance services or software licenses and support. Marzik and GMRI are restricted from selling anything other than computer equipment on behalf of the OEM organizations they represent which includes SUN/STK. They cannot provide quotes for software operating system services or licenses to any independent service organization or third party.

24. Moreover, Mr. Willcockson confirmed that the last equipment purchase made by NAVO from Marzik occurred in June 2004 for STK tape units. Even in that purchase, NAVO elected not to upgrade the maintenance service for the tape units and chose to have only the standard warranty which is provided at no additional cost.

25. Based upon the concerns for any outage whatsoever that are now being asserted by the Agency, one would think that NAVO would have upgraded the standard warranty to the SUN/STK elite maintenance program which provides services 7 days per week; 24 hours per day; with a 2 hour response time objective to any request for remedial maintenance service. Instead, NAVO chose the standard warranty, which provides for service 5 days per week; 8 hours per day; with a next business day response time objective; with no guarantee of repair time.

FURTHER AFFIANT SAYETH NOT

David L. York

STATE OF MISSOURI )
) SS
COUNTY OF ST. LOUIS )

On this 29th day of December, 2006, before me personally appeared David L. York, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.

NOTARY PUBLIC

My Commission Expires: 12/06/2008

Wanda L Grimm
Notary Public Notary Seal
State of Missouri County of St. Louis
My Commission Expires 12/06/2008
Commission # 04548813





12/29/2006 16:38 6182345554 THE KELLOGG LAW FIRM PAGE 20/20

# THE KELLOGG LAW FIRM

*The Kellogg Law Firm*
*Attorneys at Law*

2129 W. Main Street
Belleville, IL 62226

(618) 234-1900

**FAX (618) 234-5594**

***Facsimile***
FOR IMMEDIATE DELIVERY

| To | Firm Name | Phone | Fax |
|---|---|---|---|
| George Barclay | | | 202-501-0583 |
| Andrew Sinn | Assistant Regional Counsel | | 404-331-1231 |
| | | | |
| | | | |
| | | | |
| | | | |

From: Steven E. Kellogg

Date: December 29, 2006

**Message:**

Total Number of Pages, Including this page:

If you do not receive all of the pages, please call **(618) 234-1900** as soon as possible.

**Confidentiality Note**
The information contained in this facsimile transmission is legally privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this transmission is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this transmission is strictly prohibited. If you have received this transmission in error, please immediately notify us by collect telephone call and return the original transmission to us at the above address by U.S. mail. Thank you.