IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CHE CONSULTING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 07-55C |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | Judge Wheeler |
| | ) | |
| Defendant, | ) | |
| | ) | |
| STORAGE TECHNOLOGY CORPORATION | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

**PLAINTIFF'S MOTION FOR DISCOVERY**

CHE Consulting, Inc. ("CHE"), pursuant to the Court's May 31, 2007 Order, hereby files its Motion for Discovery. Specifically, CHE seeks: (a) all notes, e-mails and other related correspondence and documents that were generated as a result of the Agency's attempt to review the marketplace and determine calculate relevant costs; and (b) to take the deposition of Ms. Brenda Spence and Mr. Peter Gruzinskas once those documents have been produced.[1]

**Introduction**

Discovery is required in this case because the Agency's supplementation to the administrative record failed to answer the two principle questions pending before the Court:

[1] Because the information contained in this Motion is not protectable, it has not been filed under seal. CHE will not, however, make this Motion publicly available until all parties agree that it is releasable without redactions.

- Does segregating the software and hardware maintenance requirements lead to finger pointing between the two vendors?
- Does such segregation result in additional and thereby unnecessary down time for the Agency?

These were the questions to be resolved when the Agency agreed, pursuant to the Court's suggestion, to conduct a market survey of other federal agencies that utilize this same or similar equipment. But for whatever reason, the Agency decided not to answer those questions, choosing instead to simply state which agencies segregate the two maintenance requirements and which ones do not.

Given the Court's specific desire for this information, it would seem natural to conclude that as a part of its market research, the Agency did in fact find the answers to these two questions. Deposing those who were responsible for the market research (i.e. Ms. Spence and Mr. Gruzinskas) would be the most logical place to fill in these obvious gaps in the Agency's research.

**The Principle Issues in the Protest**

Throughout this protest, the Agency has maintained that a restriction on competition was necessary, because if it were to de-bundle the hardware and software maintenance requirements, finger pointing between the two vendors would result and could also lead to unnecessary downtime for the NAVO complex. See AR 164, 186-89; and 3/29/07 Hearing Transcript, p. 21, lines 5-12.

CHE has responded that such allegations were conclusory in nature and that there was no evidence in the administrative record to support such claims. As such, argued CHE, the Agency's decision to bundle the two maintenance requirements lacked a rational basis and therefore contravened CICA.

Ultimately, the Court agreed with CHE that the administrative record lacked any meaningful level of specificity with respect to these issues:

> The problem, as I see it, is to determine whether an administrative record without any evidence satisfies the rational basis test. ***What I see from the administrative record is a string of conclusory type statements that may be correct or may not be, but I can't tell.*** The statements provided are in a relatively brief affidavit. They may have some logic to them, but it seems that the Agency has not done its homework in a way that it should, in a way that would be prudent.

See 3/29/07 Hearing Transcript, p. 49 (emphasis added). The Court went on to note that what the administrative record needed was "empirical data" either supporting or refuting the Agency's position that down time and finger pointing were the necessary results of segregating these two maintenance requirements.

> I'm sure that Mr. Kellogg would be the first to agree that he probably would not have a leg to stand on if the Agency had done a proper job of looking at the issue with ***some empirical data about what might be expected pro and con if it went at this one way or the other***.

Id. at p. 50 (emphasis added).

With respect to such data, the Court suggested that NAVO examine whether other agencies, that separately procure these services, experience additional down time and finger pointing between the two vendors.

> In thinking about the type of data that would be of interest to the Court, and I'm not at all trying to limit what the Agency may want to submit, ***but it seems to me it would be relevant, for example, to look at the availability requirements of these other federal agencies to see if it's the same as what this Agency requires, if it's a 97 percent availability requirement that applies, and if the approach of having two vendors satisfies that requirement fairly routinely one might conclude well, maybe two vendors would work just fine***.

Id. (emphasis added).

In the same fashion, the Court advised that it would be valuable to determine if there had been any finger pointing issues at the agencies that had de-bundled the two maintenance requirements.

> It would be of interest to know whether other agencies have had any evidence of finger pointing or disagreement as we might say when two vendors are employed.

Id.[2]

On April 5, 2007, the Agency agreed that it would conduct a market survey and supplement the administrative record with its results. On May 21, 2007, the Agency reported the results of its research by filing the declarations from Ms. Brenda Spence, Peter Gruzinskas, Tom Dunn, Captain Jeffrey Best, and Rear Admiral Timothy McGee.[3]

**The Supplementation to the Record did not Fill in the Gaps**

These declarations do not, however, reveal whether those agencies who separately procure the services experience undue down time or have to suffer through vendors that blame each other for service disruptions. Considering these were the two primary reasons given by NAVO for combining these services into a single procurement, its failure to report such findings leaves us exactly where we were before NAVO's May 21, 2007 supplementation. Moreover, considering the Court's desire for this specific information, one has to assume that either Ms. Spence or Mr. Gruzinskas obtained this information but for whatever reason did not report it.

[2] Finally, the Court considered the issue of how the Agency's costs would be impacted by a de-bundled approach to the procurement to be of some usefulness. Id. at pp. 50-51.

[3] The latter three declarations contain the same conclusory remarks that triggered, in the Court's view, the need to supplement the administrative record. That is why CHE has limited its request to take depositions to Ms. Spence and Mr. Gruzinskas.

Indeed, the only information provided by Ms. Spence that is even remotely related to these two issues is that there are some agencies that combine the two maintenance services and some that do not. Ms. Spence claims that those that do have complex systems, and those that do not have inferior systems. Missing from her declaration, however, is how she or the Agency defines a complex system. That would be an obvious inquiry during her deposition.

Furthermore, the objectivity of Ms. Spence's declaration must also be questioned. Apparently, she or Mr. Gruzinskas only attempted to contact one of the vendors from CHE's list of 16 governmental entities that – unlike NAVO – separately procure hardware and software maintenance requirements. According to Mr. Gruzinskas, the Agency did not have the specific contact information to locate the appropriate personnel. See AR 412, ¶ 13. That was so, apparently, because neither he nor Ms. Spence made any effort to contact CHE to obtain that information.

Yet the Agency had no problem contacting the Intevenor, SUN/STK, to obtain contact information for their contracts. See AR 399 ("Navy representative Pete Gruzinskas contacted Sun to obtain a point of contract to identify other Sun customers to survey"). One would think that if an Agency was attempting to objectively examine the relevant market, it would make efforts to contact the Protester's customers in the same fashion that it attempted to contact the Invervenor's. Yet that did not occur.

Other signs of the Agency's lack of objectivity are the selective quotes provided from those who bundle the services. As an example only, Ms. Spence set forth the following quotation of Russell Goebel from Sandia National Laboratories: "I wouldn't seek 3rd party support for the STK devices anymore than I'd look for [a] shade tree

mechanic to work on a BMW to save dollars." AR 397-98. Comparing CHE (a 3rd party provider) to a tree mechanic seems rather hyperbolic for an objective analysis.

Along the same lines, one would assume that the agencies that do not bundle the maintenance requirements supplied encouraging comments about their 3rd party maintenance providers. Why then were such positive quotations omitted from the declarations?

To be clear, CHE is not claiming or even implying that either Ms. Spence or Mr. Gruzinskas submitted untruthful affidavits. Rather, the point we are making is that they have been placed in an impossible situation. Both personally believe that these services must be procured as a single contract, but have been tasked to provide an objective market analysis in the middle of an on-going litigation. That cannot realistically be done, which is why Courts routinely reject such "*post hoc* rationalizations as a basis for the agency's action." Orion International Technologies v. United States, 60 Fed. Cl. 338, 343 (2004), citing, Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50 (1983).

Given the fact that NAVO has attempted to provide a *post hoc* rationalization for its decision to bundle these services, fairness dictates that CHE be given an opportunity to examine the true objectivity of that rationalization. And the only way to reasonably and fairly accomplish that, is to depose those who were assigned to conduct the market survey – i.e. Ms. Spence and Mr. Gruzinskas.

## Legal Standard for Discovery

Recognizing that the administrative record in a bid protest action is something of a fiction,[4] this Court "has adopted a flexible approach both in putting together the evidence that will be considered and in discovery, balancing the limited nature of the court's review with the competing need to recognize potential exceptions to treating the agency's submission as the four corners of the inquiry." International Resource Recovery, Inc. v. United States, 59 Fed. Cl. 537, 542 (2004), citing GraphicData LLC v. United States, 37 Fed. Cl. 771, 780 (1997). Put another way:

> Effective judicial review of an agency's exercise of discretion is irreconcilably at odds with the notion that the reviewing court's inquiry must be confined to an administrative record that is likewise the product of the agency's sole discretion.

Pikes Peak Family Housing, LLC v. United States, 40 Fed. Cl. 673, 677 (1998).

Generally, courts will allow discovery in a bid protest action where one of the following eight factors is present:

> (1) when agency action is not adequately explained in the record before the court;
>
> (2) when the agency failed to consider factors which are relevant to its final decision;
>
> (3) when an agency considered evidence which it failed to include in the record;
>
> (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly;
>
> (5) in cases where evidence arising after the agency action shows whether the decision was correct or not;

[4] "Our Court has gone so far as to call the administrative record of an informal agency decision 'a fiction,' because it is prepared by an agency after the decision has been made in response to questions about the validity of the decision or decision making process." Orion International Technologies v. United States, 60 Fed. Cl. 338, 343 (2004).

(6) in cases where agencies are sued for a failure to take action;

(7) in cases arising under the National Environmental Policy Act; and

(8) in cases where relief is at issue, especially at the preliminary injunction stage.

Esch v. Yeutter, 876 F. 2nd 976, 991 (D.C. Cir. 1989); GraphicData, 37 Fed. Cl. at 779.

In this case, the first four scenarios are clearly at issue. Under scenario one, discovery is permitted when "agency action is not adequately explained in the record before the court." Id. Here, NAVO claims that de-bundling the maintenance requirements will lead to finger pointing and down time. Despite the Agency's recent attempt to supplement the administrative record, there continues to be no evidence before the Court supporting these claims.

Under the second Esch scenario, discovery is allowed when the "agency failed to consider factors which are relevant to its final decision." Id. In this case, had NAVO contacted the list of agencies provided by CHE, it would have determined for itself that segregating these two maintenance requirements does not automatically lead to down time and finger pointing.

Scenario three allows for discovery when an "agency considered evidence which it failed to include in the record." Id. In this case, it is difficult to imagine that given the Court's instructions, neither Ms. Spence nor Mr. Gruzinskas asked those agencies that do not bundle whether they experienced down time or finger pointing. Thus, it is believed, that deposing both individuals will reveal what information was provided to the Agency in that regard, yet omitted from the supplemental declarations.

Finally, scenario four concerns situations where "a case is so complex that a court needs more evidence to enable it to understand the issues clearly." Id. This factor

certainly applies. Consider, as an example only, the fact that the Agency continues to argue that NAVO is essential for ongoing Naval operations. What we don't know is whether the SUN/STK robotic tape libraries serve those Naval needs. Consider, for example, that NAVO, according to its website, has a number of different computers in operation, many of which are manufactured by different companies. Perhaps it is one of the supercomputers – not the tape library – that supports the 15% computational cycles dedicated to ongoing Naval operations. If so, then concerns over adversely impacting the national defense would be substantially diminished.

Moreover, one of the main arguments being advanced by NAVO is that if more than one vendor maintained the equipment, then problems with down time could occur. Yet we know from NAVO's website that there are a number of different computers manufactured by different companies at that facility.[5] Presumably, these systems are maintained by different vendors. How then, one must wonder, has system availability been adversely impacted by having more than one vendor maintain the various computer systems at NAVO?

Finally, in his supplemental affidavit, Mr. Gruzinskas described a situation where IBM was unable to repair one of its storage disks. See AR 410-11. The most interesting aspect about that anecdote was the fact that the Agency "compensated by using other available systems to meet the need for critical model runs and product generation to support the operational Navy." Id. at ¶ 11. Thus, the obvious question becomes what other redundant systems does NAVO have in place to meet the operational needs of the Navy if there is a problem with the robotic tape library system?

---

[5] See http://www.navo.hpc.mil/usersupport/resourceguide.html

Obviously, the technical issues surrounding this protest are complex. Deposing Mr. Gruzinskas on these and other technical-related issues will enable the Court to understand the pertinent issues of this protest more clearly.

**Conclusion**

Because the Agency has been given the opportunity to provide a *post hoc* rationalization for its decision to bundle these maintenance services, fairness dictates that CHE must be allowed to examine the thoroughness and overall accuracy of the Agency's supplementation. After all, that record was compiled in the middle of this ongoing litigation.

In addition, at least four of the eight Esch factors are present that warrant discovery in this action. CHE's discovery requests are limited. We seek all written material generated by the Agency's market research and cost analysis. Once that has been turned over, we request to depose only two of the five persons that provided declarations in the May 21 supplement. Because the scope of the inquiry is limited, and will serve the overall purpose of determining whether the Agency can justify its purposeful restriction on competition, CHE's discovery requests should be granted.

Respectfully submitted,

THE KELLOGG LAW FIRM

By /s/ Steven E. Kellogg

Steven E. Kellogg
2129 W. Main Street
Belleville, IL 62226
(618) 234-1900
(618) 234-5594 FAX
skellogg@kellogglawfirm.com

Attorney for the Plaintiff

**Certificate of Service**

I hereby certify that on June 8, 2007, the foregoing was filed electronically. I understand that notice of this filing be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Steven E. Kellogg
Steven E. Kellogg