# In the United States Court of Federal Claims

No. 07-55C

(Filed Under Seal: September 11, 2007)
(Reissued: September 12, 2007)[1]

| | | |
|---|---|---|
| ************************************* | * | |
| CHE CONSULTING, INC., Plaintiff, | * | Pre-award Bid Protest; Challenge to Agency's Merger of Hardware and Software Maintenance Requirements; Rational Basis Test; Supplementation of the Administrative Record. |
| v. | * | |
| THE UNITED STATES, Defendant, | * | |
| and | * | |
| STORAGE TECHNOLOGY CORPORATION, Defendant-Intervenor. | * | |
| ************************************* | * | |

*Steven E. Kellogg*, The Kellogg Law Firm, P.C., Belleville, Illinois, for Plaintiff.

*F. Jefferson Hughes*, with whom were *Peter D. Keisler,* Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Brian M. Simkin*, Assistant Director, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., *Andrew Sinn*, GSA Office of Regional Counsel, Atlanta, Georgia, Of Counsel, for Defendant.
*John J. O'Brien*, Cohen Mohr LLP, Washington, D.C., for Defendant-Intervenor.

---

[1]Because this opinion and order might have contained "confidential or proprietary information" within the meaning of the Rules of the Court of Federal Claims Appendix C, ¶ 4, it was initially filed under seal. The parties were requested to submit proposed redactions on or before September 18, 2007, but actually did so within one day. After receipt and consideration of these proposals, the decision was prepared for publication. The resulting redactions are shown by brackets enclosing asterisks as follows: [***].

OPINION AND ORDER

WHEELER, Judge.

This bid protest involves the Government's acquisition of hardware and software maintenance services for robotic tape library systems used by the Naval Oceanographic Office ("NAVO") at Stennis Space Center, Mississippi. NAVO maintains large silo-type storage libraries of tape drives that can be accessed with robotic arms and communication devices. The maintenance services are necessary to assure that the robotic tape retrieval system functions properly to support critical needs of the Department of Defense ("DoD") and civilian users.

Defendant-Intervenor Storage Technology Corporation ("StorageTek") is the original manufacturer of these robotic tape retrieval systems, and StorageTek's parent, Sun Microsystems, owns the system software as intellectual property. Plaintiff CHE Consulting, Inc. ("CHE"), a prospective maintenance provider, acknowledges that only StorageTek or a licensee can perform the required software maintenance, but challenges the Government's merging of the hardware and software maintenance services into single acquisitions.[2] CHE contends that it is capable of performing the hardware maintenance services, and points to its experience with other federal agencies who have separated the hardware and software maintenance components to achieve greater competition. CHE protests its exclusion from the competition that results from NAVO's merger of the hardware and software maintenance requirements, and asserts that the Government's actions violate the Competition in Contracting Act ("CICA"), 41 U.S.C. § 253(a)(1)(A); 10 U.S.C. § 2304(a)(1)(A).

Defendant asserts that the Government's merger of the maintenance requirements is reasonable and justified. NAVO operates one of DoD's Major Shared Resource Centers ("MSRCs") at the Stennis facility, a supercomputing center that acquires and analyzes oceanic and shoreline data for critical defense and civilian needs worldwide. The NAVO MSRC broadly supports Navy fleet operations by providing essential warfighter information 24 hours per day, seven days per week. The NAVO MSRC furnishes such data as ocean current direction and speed, wave height and direction, water salinity, wind speed and direction, and relative humidity. The NAVO databases also include information on ocean

---

[2] This protest does not involve the concept of "bundling" as defined in the Federal Acquisition Regulation ("FAR") ¶ 2.101. Although Plaintiff uses this term repeatedly in describing the Government's merger of maintenance services, "bundling" involves the consolidation of "two or more requirements for supplies or services previously provided or performed under separate smaller contracts, into a solicitation for a single contract that is likely to be unsuitable for award to a small business concern." FAR ¶ 2-101. Such is not the case here.

depth and floor type. The NAVO MSRC is a key part of DoD's High Performance Computing Modernization Program, supporting weapons programs such as the Joint Strike Fighter, Unmanned Aerial Vehicles, Medium Tactical Vehicles Requirement, and the Javelin Missile Program. The MSRC must maintain 97 percent availability, and has actually achieved greater than 99 percent availability since 2003. The NAVO MSRC also is the back-up Disaster Recovery Center for five other DoD supercomputer centers, including DoD's three other MSRCs. Due to the size and complexity of the MSRC system, and its mission critical services to the military, NAVO determined that its hardware and software requirements should be awarded to a single contractor. Defendant contends that the merger of the maintenance services does not violate CICA because such action is necessary to meet its minimum needs. Defendant still expects adequate competition from the many authorized maintenance providers for StorageTek software, some of whom are small businesses.

The case is before the Court on the parties' cross-motions for judgment on the Administrative Record, pursuant to Rule 52.1. At the Court's request, Defendant has supplemented the Administrative Record with additional information bearing upon its determination that the hardware and software maintenance requirements should be combined and not separated. For the reasons explained below, the Court grants the motions of Defendant and Defendant-Intervenor for judgment on the Administrative Record. The Court concludes that NAVO's decision to combine the hardware and software maintenance requirements was not "arbitrary, capricious, [or] an abuse of discretion," and was otherwise in accordance with law. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 n.5 (Fed. Cir. 2001). The Court also is mindful of its statutory duty to "give due regard to the interests of national defense and national security." 28 U.S.C. § 1491(b)(3). This is not a case where the Court should substitute its judgment for that of the procuring agency.

## Factual Background

On August 21, 2006, the General Services Administration ("GSA"), acting on behalf of NAVO, issued Solicitations 4THG17072001 and 4THG17072002 for follow-on hardware and software maintenance of StorageTek robotic tape library systems. Administrative Record ("AR") 1, 33, 153. GSA issued two solicitations instead of one for administrative and accounting reasons. AR 153. The first solicitation covered maintenance of the MSRC's Disaster Recovery systems, and the second solicitation covered maintenance of all systems except Disaster Recovery. Id. The solicitations required that both the hardware and software maintenance services be provided by one contractor. AR 2-3, 33-35, 139. The solicitations stated that the period of performance would be from October 1, 2006 through September 30, 2007, and specified that the required maintenance coverage was "7 days a week, 24 hours a day with a 2 hour response time." AR 1, 2, 33.

On August 23, 2006, CHE notified GSA's Contracting Officer that the software component of these acquisitions could only be performed by StorageTek, because the parent corporation, Sun Microsystems, owned the software as intellectual property. AR 139, 153, 191. However, CHE stated that the hardware maintenance services on the robotic tape library system could be performed by a number of different vendors, including CHE. AR 191. CHE requested that the maintenance be separated into two separate contracts, one for hardware and one for software, so that full and open competition could be achieved. Id.

Due to CHE's challenge of the agency's "single vendor" position, GSA's Contracting Officer extended the solicitation closing date to August 31, 2006 to obtain additional information. AR 153. The Contracting Officer contacted MSRC on-site technical staff from Lockheed Martin Space Operations who, apparently without consulting NAVO representatives, stated that no technical reason would prevent the award of separate hardware and software maintenance contracts to two vendors. AR 160, 162. The Contracting Officer thereupon separated the requirements to allow for performance of hardware and software maintenance by multiple vendors. AR 140, 153.

CHE submitted a proposal for the hardware maintenance by the August 31, 2006 closing date, and the Contracting Officer forwarded the package of proposals to NAVO for evaluation and review. AR 140, 153, 192. NAVO's Peter Gruzinskas, a Contracting Officer's Representative, and Robert Knesel, a NAVO MSRC Deputy Director, informed GSA's Contracting Officer that they were unaware the requirement had been changed to allow multiple awards, and contended that the Lockheed Martin views had not considered the complexity of the system configuration, the challenges of multiple vendor support, the significance of the High Performance Computer Program to DoD, and the impact of system outages on mission critical programs. AR 153-54. Mr. Gruzinskas provided additional support to the Contracting Officer on September 28, 2006, addressing reasons why the maintenance requirements should not be awarded to multiple vendors. AR 164.

After receipt and review of the information from NAVO, GSA's Contracting Officer determined that the multiple award strategy would not be in the best interests of NAVO. AR 140, 154. The Contracting Officer redefined the solicitation requirements to provide for a single vendor for both hardware and software maintenance. AR 154. After obtaining GSA legal review, the Contracting Officer cancelled Solicitations 4THG17072001 and 4THG17072002 on November 14, 2006, and issued new Solicitations 4THG17078067 and 4THG17078068 on December 5, 2006. AR 154, 169-85. The new solicitations specified a performance period of January 1, 2007 through December 31, 2007, with options for two additional years. AR 173, 180.

Upon issuance of the new solicitations, CHE filed an agency-level protest with GSA on December 7, 2006, pursuant to FAR ¶ 33.103. AR 191. CHE asserted again that the agency's merger of the hardware and software maintenance requirements violated the full and open competition requirements of CICA, 41 U.S.C. § 253(a)(1)(A); 10 U.S.C. § 2304(a)(1)(A). Id. In its protest, CHE cited seven examples of other federal agencies that had separated similar hardware and software maintenance requirements. AR 194.[3] CHE further asserted that it had 104 contracts with federal, state and local governments, and that none of them combined the hardware and software services together. AR 195.

On January 12, 2007, GSA's Office of the Chief Acquisition Officer denied CHE's agency-level protest. AR 139-43. After reviewing the information provided by both parties, the Acting Agency Protest Official, George N. Barclay, concluded that:

> . . . NAVO has met its burden to provide a reasonable basis for its need to receive hardware and software maintenance from a single vendor. NAVO has shown that its paramount concern in seeking a single vendor is related to avoiding disruptions in service as such disruptions would adversely affect its critical missions and those of its customers. . . . [T]he critical, high priority research conducted using MSRC archive data and the production of information from that data is essential to U.S. Navy fleet operations as well as on-going DOD military operations. The record before this office reflects that any delay caused by interruption of service, whether due to finger-pointing or failure to timely and properly maintain the NAVO systems, would unduly disrupt the performance of NAVO and other DOD missions. NAVO's emphasis on reliability of its systems and the ability to provide its services on a continual uninterrupted basis has a direct impact on U.S. Navy and DOD mission critical operations. Accordingly, the protest is denied.

AR 142-43. Following receipt of this GSA decision denying its protest, CHE filed suit in this Court on January 24, 2007.

---

[3] The seven examples cited by CHE included: the Bureau of Public Debt, the Defense Information Systems Agency, the Immigration & Naturalization Service, the Naval Post-Graduate School, the Military Entrance Processing Command, the Personnel Enlisted Records Management System, and the Federal Reserve Bank System. AR 194. CHE provided additional examples in its Complaint in this action. See Complaint at 4-5; see also AR 371-83 (December 29, 2006 Affidavit of David York, CHE's President and Chief Executive Officer, submitted in the agency-level protest).

Summary of Court Proceedings

In its Verified Complaint, CHE asked for a declaratory judgment, as well as temporary, preliminary, and permanent injunctive relief. Complaint at 1, 10-11. At the initial conference in this matter, counsel for the parties agreed that an existing contract for NAVO's maintenance services could be extended until the Court decided the merits of CHE's protest. Jan. 26, 2007 conference, tr. 4-6. Accordingly, the Court's consideration of a temporary restraining order or preliminary injunction was unnecessary. On January 31, 2007, the Court permitted StorageTek to intervene as a party defendant. Thereafter, Defendant filed the certified Administrative Record on February 8, 2007, and the parties submitted cross-motions for judgment on the Administrative Record, pursuant to Rule 52.1. In the briefing of the cross-motions, each party submitted a supplement to the Administrative Record. On March 1, 2007, Defendant submitted a copy of CHE's reply brief in the agency-level protest, including an Affidavit of Mr. York. On March 6, 2007, CHE submitted Defense Information Systems Agency procurement materials, the Declaration of William F. Eldridge (produced in another protest in this Court), and an Affidavit of Mr. York.

At a March 29, 2007 oral argument, the Court observed that the agency's justification for combining the hardware and software maintenance services appeared to be lacking the necessary support, and the Court questioned whether NAVO and GSA had researched the single acquisition issue as carefully as they should. Mar. 29, 2007 hearing, tr. 49-53. The Court observed that there may be "some logic" to the merging of the requirements, but that "the Agency has not done its homework in a way that it should." Id. at 49. The Court suggested, for example, that NAVO and GSA examine the practices of other agencies regarding the merger or separation of similar maintenance requirements. Id. at 50. The Court asked Defendant to consider the following factors, among others: (1) whether other agencies have the same or similar system availability requirements that NAVO does; (2) whether other agencies have experienced any "finger-pointing" or disagreement when two vendors are used; (3) whether competition is affected by choosing one approach instead of the other; and (4) whether any cost impact results from combining instead of separating the requirements. Id. at 50-51. The Court summarized the Administrative Record as offering "fairly scant" support for the approach taken. Id. at 54.

On April 5, 2007, the Court conducted a follow-up telephone conference with the parties to determine whether Defendant should perform further analysis and supplement the Administrative Record on the pros and cons of merging the maintenance requirements. April 5, 2007 conference, tr. 3-8. With the agreement of counsel, the Court allowed 45 days, until May 21, 2007, for Defendant to perform further analysis of the proposed single acquisition approach. Id. at 8. Thereafter, Defendant filed a supplement to the Administrative Record on May 21, 2007, adding tab 13 to the record. The additional data consisted of the

Declarations of Brenda Spence, Peter Gruzinskas, Tom Dunn, and Captain Jeffrey Best, and the Affidavit of Rear Admiral Timothy McGee. AR 385-418. Ms. Spence also provided a Cost Benefit Analysis. AR 404-07.

On June 8, 2007, CHE filed a motion for discovery requesting the agency to produce documents generated in the course of performing the market survey, and for leave to take depositions of the Contracting Officer, Ms. Spence, and of Mr. Gruzinskas. Defendant and StorageTek opposed CHE's motion on June 25, 2007. By Order dated July 8, 2007, the Court denied CHE's motion, concluding as follows:

> Plaintiff's June 8, 2007 discovery motion reflects disagreement with the agency's decision rationale, but does not convincingly identify any areas where the Administrative Record requires further supplementation. Although Plaintiff relies upon factors (1) through (4) in Esch v. Yeutter, 876 F.2d 976, 991 (D.C. Cir. 1989) as authority for its discovery, the Court is not persuaded that the agency's decision "is not adequately explained," that the agency "failed to consider factors which are relevant to its final decision," or that the "agency considered evidence which it failed to include in the record." Id. Similarly, the Court does not find this case so complex that more evidence is needed to enable a clear understanding of the issues. Id. Accordingly, Plaintiff's motion for discovery is DENIED.

Order, July 8, 2007, at 1-2. Thereafter, on July 30, 2007, CHE filed its second motion for judgment on the Administrative Record, as supplemented. Defendant and Intervenor filed cross-motions and responses on August 20, 2007, and CHE filed a reply on August 27, 2007. The Court must decide the issue of whether the agency's determination to combine the hardware and software maintenance services is rationally based.

## Agency Rationale for Combining the Hardware and Software Maintenance

According to Defendant, NAVO's Major Shared Resource Center at Stennis Space Center, Mississippi acquires and analyzes global ocean and shoreline data to provide critical products and services for DoD and civilian users worldwide. AR 156. The NAVO MSRC supports essential Navy fleet operations 24 hours per day, seven days per week. Id. Examples of NAVO's operational information include the provision of real-time acoustic models run on a classified system, ocean current direction and speed, temperature, water salinity, wave height and direction, wind speed and direction, and relative humidity. AR 188. The MSRC also provides ocean depth and floor information. Id.

Defendant states that the NAVO MSRC is a key part of the High Performance Computer Modernization Program ("HPCMP") initiated in 1992 to modernize the high performance computing capabilities of DoD laboratories. AR 155. The HPCMP provides the supercomputer services, high-speed network communications, and computational science expertise that enables DoD laboratories and test centers to conduct a wide range of research, development, and testing. The HPCMP supports current weapons programs such as the Joint Strike Fighter, Unmanned Aerial Vehicles, Medium Tactical Vehicles Replacement, and the Javelin Missile Program, by enabling the use of innovative materials, advanced design concepts, improved modification programs, higher fidelity simulations, and more efficient tests. Id. Future weapons systems, such as radio frequency weapons, the airborne laser, and the Army's future combat system, benefit from basic and applied research in plasma physics, turbulence modeling, molecular engineering, high energy materials, and advanced signal processing conducted by researchers using the HPCMP. Id. Currently, HPCMP users consist of over 4,550 scientists, engineers, computer specialists, networking specialists, and security experts from all three military departments and other defense agencies. Id.

DoD currently operates four MSRCs, including the MSRC at NAVO. AR 155. The HPCMP program requires the MSRC systems to maintain a 97 percent availability to users. AR 157. Since 2003, the NAVO MSRC has maintained greater than 99 percent availability. Id.

The NAVO MSRC also serves as the Disaster Recovery Center ("DRC") for five other HPCMP supercomputing centers, including all three of the other MSRCs available for DoD usage. These other MSRCs are located at the U.S. Army Research Laboratory at Aberdeen Proving Ground, Maryland, the Aeronautical Systems Center at Wright-Patterson Air Force Base, Ohio, and the U.S. Army Corps of Engineers Engineering Research and Development Center, Mississippi. AR 187. The NAVO MSRC also is the DRC for the Arctic Region Supercomputing Center, and the Maui High Performance Computing Center. Id. This DRC designation requires the NAVO MSRC to maintain backups of each HPCMP center's data, which NAVO must continuously provide in the event of a catastrophic loss of data at any of the other centers. Id.

The NAVO MSRC configuration consists of high end multi-processor Sun servers connected to Storage Area Networks of about 60 TeraBytes, each of which interfaces with multiple STK Powderhorn tape silos. AR 157, 187. The system includes a mixture of tape drives, including 9840, 9840B, and E10K drives. AR 157. The tape silos are controlled by a Library Management Unit connected to an automated Cartridge System Library Software environment running on another Sun workstation. Id.

Due to the complexity of the MSRC configuration and the importance of the HPCMP program to DoD, NAVO personnel determined that the hardware and software maintenance services should be awarded to a single contractor. AR 153-54. NAVO personnel were concerned of the challenges of multiple vendor support, and the potential impact of system outages to critical DoD programs. Id. In particular, NAVO's Mr. Gruzinskas noted that the systems consist of a tightly integrated collection of hardware, software, and firmware,[4] and was concerned that troubleshooting one component potentially could impact other components. AR 154. Mr. Gruzinskas conclusively demonstrated through actual examples that error messages on a computer screen may be "generic" and that diagnosis in a tightly integrated system may be difficult. AR 410-11. He observed that pinpointing an error to hardware or software is problematic, such that "[h]ardware and software cannot be separated *effectively* to achieve our desired results." AR 410. GSA's Contracting Officer concurred with the NAVO representative views. AR 157-58, 403.

Defendant's supplement to the Administrative Record contains the results of NAVO's and GSA's market research. Among other things, NAVO and GSA determined that agencies with complex or mission critical systems, such as the other DoD MSRCs, acquire hardware and software maintenance as a total solution from one maintenance provider having an agreement with the original equipment manufacturer. AR 386. These agencies typically follow a one-maintenance provider approach to assure continuity of operations. They regard the risks associated with separating hardware and software maintenance as too great. Id.

The usage of a single contractor, however, still is likely to result in adequate competition. The Contracting Officer, Brenda Spence, observed:

> There are multiple small business third party maintenance providers with established relationships with the [original equipment manufacturer] that can and do perform both hardware and software maintenance. Many of these vendors have established federal supply schedule (FSS) contracts with [the] General Services Administration (GSA) to provide hardware and software maintenance on Storage Technology (STK)/Sun equipment.

AR 387.

The supplement to the Administrative Record contains a cost benefit analysis, weighing the potential cost savings from splitting the maintenance work into two contracts

---

[4] "Firmware" is software imbedded in hardware that operates on its own. March 29, 2007 hearing, tr. 18; AR 409.

against the perceived risks of two contracts. NAVO and GSA determined that the additional costs of acquiring a single contract for both hardware and software maintenance would be $[***] annually, or $[***] per day. AR 404-08. The analysis concluded that "[i]f the center is down more than [***] year, the loss to the center would exceed any potential cost savings of a split approach." AR 406. Moreover, the agencies noted that any increased risk of injury or loss of life that might arise from increased downtime would not be in the Government's best interests even with a cost savings. AR 407. The Declaration of Captain Jeffrey Best provides an actual example from the Iraqi War where U.S. Marines benefitted from having NAVO MSRC data, and thereby potentially saved American lives. AR 416-17.

The supplement to the Administrative Record also includes an Affidavit of Rear Admiral Timothy McGee, Commander of the Naval Meteorological and Oceanography Command since July 2004. AR 418. Rear Admiral McGee notes that the NAVO MSRC is "critical for safe and effective operations of the Navy and Marine Corps and Department of Defense." Id. He further observes that "15% of the computational cycles are dedicated to supporting Navy operations with precise real-time oceanographic and meteorological products critical to warfighting and missions in support of the national defense." Id. His concluding paragraph states:

> I have reviewed the affidavit of Mr. Peter Gruzinskas, dated December 18, [2006], and also conferred with Mr. Tom Dunn, Director, MSRC, and I agree with their shared opinion that maintaining a consolidated hardware and software maintenance contract with a single vendor is the best approach to safeguard the continuous operation of this vital military capability. This approach ensures system availability and the avoidance of "finger-pointing" between support contractors over responsibilities and system reliability. I believe that to separate the hardware and software maintenance contracts would cause the MSRC to incur unacceptable risk to its critical support mission, considering the U.S. Navy's mission and role in our national defense. In my judgment the continued availability of the MSRC to ongoing operations is too significant to place at risk.

Id. at ¶ 4.

## Discussion

### A. Jurisdiction and Standard of Review

This Court has jurisdiction over pre-award and post-award bid protests pursuant to 28 U.S.C. § 1491(b)(1), as amended by the Administrative Dispute Resolution Act of 1996 (ADRA). Pub. L. No. 104- 320, §§ 12(a)-(b)(1996).

In reviewing motions under Rule 52.1, the Court must determine "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A&D Fire Protection, Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005)). The Court must make findings of fact where necessary. Id. The resolution of cross-motions for judgment under Rule 52.1 is akin to an expedited trial on "the paper record." Id.

The Court's review of bid protest actions is governed by the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Under this standard, a reviewing Court shall set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)); see also 28 U.S.C. § 1491(b) (describing the Court's bid protest jurisdiction). Thus, a procurement decision may be set aside if it lacks a rational basis or if an agency's decision-making constitutes a violation of regulation or procedure. A&D Fire Protection,72 Fed. Cl. at 132 (citing Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). Plaintiff bears the burden of proving the arbitrary and capricious nature of the agency action. Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 1000 (Fed. Cir. 1996) (citing CACI Field Servs., Inc. v. United States, 854 F.2d 464, 466 (Fed. Cir. 1988)).

When matters of greater agency discretion are involved, it is more difficult for a protestor to prove that a procurement decision was arbitrary and capricious. A&D Fire Protection, 72 Fed. Cl. at 132 (citing Burroughs Corp. v. United States, 223 Ct. Cl. 53, 64, 617 F.2d 590, 597 (1980)). Moreover, where acquisitions concerning national defense and security are involved, the Court must afford even wider deference to the agency. As the Government Accountability Office has observed, "[w]here a requirement relates to national defense or human safety . . . an agency has the discretion to define solicitation requirements to achieve not just reasonable results, but the highest possible reliability and/or effectiveness." MCI Worldcom Deutschland GmbH, B-291418, 2003 CPD ¶ 1 at 5; see also CHE Consulting Inc. v. United States, 74 Fed. Cl. 742, 748 (2006) ("[D]ue to the critical nature of this computer equipment, the Court finds that DISA's insistence that the equipment

be maintained with 'the highest level of maintenance service' is a minimum need to DISA and is rationally related to that need."); see also 28 U.S.C. § 1491(b)(3) ("In exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action.").

B. The Agencies' Decision to Combine the Hardware and Software Maintenance in One Contract is Reasonable.

Based upon the Administrative Record, the Court is persuaded that NAVO and GSA have a reasonable basis to combine the hardware and software maintenance services at the NAVO MSRC in one contract. The record as a whole demonstrates that many DoD offices with complex, sophisticated, mission critical computer operations refuse to split hardware and software maintenance services. These agencies, including NAVO, are concerned that splitting the services would create a greater risk of system failure and downtime. Any cost savings that might be realized through separate contracts is deemed unjustified due to the increased risk of system failure. AR 406-07. As NAVO's Mr. Gruzinskas noted, "[w]e constantly look for ways to cut costs on our contract expenditures, but this is not a prudent method to seek savings." AR 412.

The Administrative Record, as supplemented, confirms NAVO's concerns regarding "finger-pointing" between contractors, and potential conflicts over maintenance or repairs performed with parts other than those from the original manufacturer. AR 389, 391-92. Further, NAVO has established that the MSRCs are essential military facilities supporting Navy fleet operations, including warfighters in combat, 24 hours per day, seven days per week. AR 409, 413-14, 416-18. NAVO has demonstrated that adequate competition is available for obtaining the Navy's maintenance services on an undivided basis. AR 400-03. Defendant's supplemental information shows that robotic tape library users with more complex missions generally select a combined maintenance solution, while those with a less demanding system often select separate maintenance vendors, presumably to realize cost savings. AR 386-99. NAVO has shown that the lower risk associated with a combined maintenance solution represents the minimum requirement for NAVO's MSRC. AR 403, 407, 412, 414-15, 417-18.

Plaintiff CHE contends that it currently maintains 75 hardware maintenance service contracts for StorageTek robotic tape library systems at over 200 locations in the United States. See Plaintiff's March 6, 2007 Motion for Judgment on the Administrative Record, at 3-4. CHE also has asserted that as many as 16 federal agencies allow for the provision of hardware and software maintenance by different vendors. Complaint at 4-5. Without diminishing the import of CHE's assertion, it appears that such an approach is followed for systems with more routine uses, such as financial and personnel records processing, military

and other inductee processing, immigration records processing, supply management and medical records processing. AR 194; Complaint at 4-5. CHE's most compelling example is the Defense Information System Agency ("DISA"), but there is no evidence that even DISA's system supports comparable warfighter activities or supercomputer research capabilities. Moreover, none of CHE's examples rise in importance to being the Disaster Recovery Center for all of DoD's supercomputer centers.

CHE has maintained throughout that no evidence exists of "finger-pointing" or increased system downtime when two maintenance vendors are used instead of one. While the Court agrees that no precise empirical data exists where a comparable agency has tried both the combined and separate maintenance approach, it is enough to see that a greater likelihood of such risks is present when the agency must manage multiple vendors instead of one vendor. The Court is satisfied that the agencies' desire to avoid these risks for their mission critical activities is reasonable. CHE's position in sum represents "mere disagreement[] with the contracting officer's assessment of the risks associated with its proposal." Int'l Outsourcing Servs., LLC v. United States, 69 Fed. Cl. 40, 49 (2005).

C. Supplementing the Administrative Record

The Court may request supplementation of the Administrative Record in appropriate circumstances. Impresa, 238 F.3d at 1338 (supplementation is permissible where "required for meaningful judicial review"); Blue & Gold Fleet, LP v. United States, 70 Fed. Cl. 487, 494 (2006) (Court will supplement the administrative record when necessary for a full and complete understanding of the issues); Rig Masters, Inc. v. United States, 70 Fed. Cl. 413, 424 (2006) (supplementing the administrative record is a matter within the discretion of the trial court, and generally is permitted to assist the Court in understanding an agency decision when the record has not adequately explained it); Stapp Towing, Inc. v. United States, 34 Fed. Cl. 300, 308 (1995) (supplementation is allowed when the agency failed to consider factors which are relevant to its final decision); Protection Strategies, Inc. v. United States, 76 Fed. Cl. 225, 233-34 (2007) (allowing additional information that would not have been contained in the administrative record).

Here, as the Court expressed at the March 29, 2007 oral argument, the original Administrative Record appeared "scant" in failing to provide evidence of whether other agencies combine or separate maintenance services, and in failing to provide any cost analysis of the savings that might be derived from separating instead of combining the services. March 29, 2007 hearing, tr. 49-54. The Court acknowledged that the agency's position had some intuitive "logic," but suggested that review would be more meaningful with a fuller record. Id., tr. 49. The Court left open the possibility that the agency's market

survey and cost analysis might even support CHE's view that the maintenance services should be separated. Id., tr. 51-52.

CHE at first concurred with the approach of having NAVO and GSA perform further market review, perhaps hoping that the market research would cause the agencies to agree that the services should be separated. However, with the agencies' position unchanged, CHE now asserts that the original Administrative Record contained no support for the agencies' acquisition strategy, and that the supplemental materials added to the record should be disregarded as a "post hoc rationalization." CHE contends that the Contracting Officer did not consider the supplemental materials in deciding to merge the maintenance services, and therefore they were not part of the procurement process. See Plaintiff's July 30, 2007 Second Motion for Judgment on the Administrative Record, at 2-4, citing Arch Chemicals, Inc. v. United States, 64 Fed. Cl. 380, 386 (2005) (documents created "after-the-fact" are suspect, because courts "recognize that they must reject 'post hoc rationalizations' as a basis for the agency action.").

The Court disagrees with CHE's contention. Even though the agencies' support for merging the maintenance services in the original Administrative Record was not as robust as it might have been, this fact does not mean that the initial decision was incorrect or that the Court should direct the agencies to separate the services. Instead, the agency agreed to perform a market survey to determine what approach other agencies followed in similar circumstances, and to look at the cost savings that might be realized from separating the services. These actions were not "post hoc rationalizations," but were efforts to obtain additional relevant information that the agencies could consider in confirming or modifying their original position. By providing this information as a supplement to the Administrative Record, Defendant has afforded the Court a basis for more meaningful judicial review.

This is not a case where the Contracting Officer made a single decision on a precise date, and then attempted to justify the decision with "after-the-fact" documentation. More accurately, at the Court's urging, the Contracting Officer reconsidered her decision with the benefit of additional data. While the Contracting Officer certainly could have altered her decision after considering the additional data, she determined instead that the additional data supported her original decision and that there was no reason to change it. In this circumstance, the 45-day period to compile further data is akin to a remand to the agency under the Court's supervision, which would have been authorized independently under Rule 52.2. The supplementation procedure followed by the Court likely produced a more expeditious result on an important procurement matter. The Court regards "supplementation" and "remand" as offering two closely related procedural choices, either of which would have produced the same outcome here.

Conclusion

Based upon the foregoing, Plaintiff has not prevailed on the merits of its action, and therefore is not entitled to declaratory or injunctive relief. Accordingly, the Court finds it unnecessary to consider the other factors pertinent to a request for such relief. Pursuant to Rules 52.1 and 54, the Clerk of the Court shall enter judgment on the Administrative Record for Defendant and Defendant-Intervenor. No costs are awarded.

This Opinion is filed under seal. On or before September 18, 2007, the parties shall carefully review this unredacted opinion for competition-sensitive, proprietary, confidential or other protected information, and submit to the Court proposed redactions to this opinion, if any, before it is released for publication.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge